## UNITED STATES v. GREENWOOD PRODUCTS CO. et al.

### Civ. No. 105–M.

United States District Court
N. D. Florida, Marianna Division.

Jan. 6, 1950.

George Earl Hoffman, U. S. Atty., Pensacola, Fla., Claude T. Coffman, Atty. for Department of Agriculture, Washington, D. C., for plaintiff.

Smith, Kilpatrick, Cody, Rogers & McClatchey, Atlanta, Yonge, Beggs & Lane, Pensacola, Fla., MacDougal, Troutman, Sams & Schroder, Atlanta, Ga., for defendants.

DE VANE, District Judge.

This is an action by the United States to recover the balance claimed to be due on peanuts that were destroyed by fire. Part of the peanuts in question were sold and delivered by plaintiff to defendant, Greenwood Products Company, under a conditional sales contract arrangement and were destroyed while they were in possession of said defendant, under said contract arrangement, but before legal title had passed. The remainder of the peanuts were "stockpiled" or stored by the defendant, Greenwood Products Company, for the account of plaintiff, under an agreement requiring Greenwood Products Company to insure such peanuts against loss by fire while stored.

The action is against Greenwood Products Company, the surety on its performance bond and the insurance companies that insured the peanuts against loss by fire. There is no controversy as to the facts. They were stipulated.

The questions presented in this case are:

1. With respect to that part of the peanuts that were sold or allocated to Greenwood Products Company, is the government entitled to recover the balance of the contract price for which it sold the peanuts to the purchaser or is it entitled only to a sum equal to the original cost to the government in acquiring the peanuts?

2. With respect to that part of the peanuts stockpiled or stored by Greenwood Products Company for the account of the Commodity Credit Corporation, is the gov-

ernment entitled to recover the resale value of the peanuts for shelling purposes or is it entitled only to a sum equal to the original cost to the government in acquiring the peanuts?

## Statement of Facts.

In 1943 there was a shortage of peanuts available to supply wartime needs and in order to direct the available supply into the proper channels the Acting War Food Administrator, acting pursuant to the provisions of the Second War Powers Act of 1942, 50 U.S.C.A.Appendix, § 633, issued Commodity Credit Corporation Order 4, 8 F.R. 7887, the effect of which was to make Commodity Credit Corporation the sole purchaser from producers of the entire 1943 peanut crop. All persons were prohibited by the Order from selling or delivering unprocessed peanuts to any one other than the Commodity Credit Corporation, an agency of plaintiff.

Commodity Credit Corporation was authorized to allocate and resell the peanuts to various processors and thus control the distribution of peanuts either for shelling and use in the edible trade or for crushing for the extraction of oil. Under the law, as it then existed, the Commodity Credit Corporation was required to support the price paid to producers for peanuts.

In carrying out the peanut program under the law, the Commodity Credit Corporation entered into a uniform "sheller" contract with each sheller and entered into a uniform "crusher" contract with each crusher. Under these contracts each processor agreed to purchase, as an agent of Commodity Credit Corporation and for the account of the Corporation, all peanuts offered for sale by producers in the production area in which its plant was located. The producers were to be paid not less than the minimum support price. For peanuts containing 70% sound, mature kernels the base price was $140 per ton. Each processor holding a contract with the Commodity Credit Corporation received an allocation limiting the quantity of peanuts he could shell or crush. Under the contract the processor was obligated to the extent of his allocation to repurchase from the Commodity

Credit Corporation peanuts for his own account. Peanuts not so repurchased by the processor were required to be stockpiled for the account of Commodity Credit Corporation. Stockpiled peanuts could be sold to any processor anywhere.

The sheller contract provided a base price of $175 per ton for Spanish peanuts containing 70% sound, mature kernels and $166 per ton for Runner peanuts containing 70% sound, mature kernels. The crusher contract provided a base price to the crusher of $92.60 per ton for Spanish peanuts containing 70% sound, mature kernels and $87.10 per ton for Runner peanuts containing 70% sound, mature kernels. Each processor was required by his contract to pay the producer with his own funds for the peanuts as they were delivered. Within five days after the close of each week the processor was required to report the quantity of peanuts purchased from producers for the account of the Commodity Credit Corporation and the quantity repurchased from the Corporation for its own account. If the peanuts were purchased under the sheller contract the processor was required to remit, with its report, the difference between the support price paid to producers for the account of the Corporation and the price payable to the Corporation for the peanuts repurchased by the shellers. If the peanuts were purchased under the crusher contract the Commodity Credit Corporation was required to remit the difference between the support price paid to producers and the price payable to the Corporation by the crushers for the repurchase of the peanuts. If the peanuts were purchased under either contract for stockpiling or stockpile purposes the processors were required to report that fact and Commodity Credit Corporation was required to remit the support price paid to the processor.

Under the sheller contract title to the peanuts purchased by a processor did not pass to the processor until full payment had been made to the Commodity Credit Corporation of the purchase price. The defendant, Greenwood Products Company, operated exclusively as a sheller, under a sheller contract. On November 6, 1943 a fire at the Graceville, Florida warehouse of Green-

wood Products Company destroyed 5,020.-1880 tons of peanuts which had been received by Greenwood Products Company under its sheller contract over a period beginning September 6, 1943 and ending with the date of the fire.

The stipulation of facts entered into by the parties classify the peanuts into four groups, but for the purpose of this case only two classifications are necessary. The four classifications arise out of the amount of paper work there had been done by Greenwood Products Company in reporting its allocations to itself and designating the peanuts held by it for stockpile purposes. So far as this case is concerned the court sees no difference in the law applicable to the peanuts held by Greenwood Products Company under its allocation, whether the paper work had been completed in reporting the allocation or whether it had not been completed. The same is true about the stockpile peanuts. Therefore, in disposing of the case the court will consider only two groups—allocated peanuts, in which Greenwood Products Company held rights under its contract, and stockpile peanuts stored by that company for the account of Commodity Credit Corporation.

*Allocated Peanuts.*

The stipulation shows that Greenwood Products Company had used up the entire allocation made to it on the day of the fire and had in its possession about 3,870.978 tons of peanuts held for its own account. The paper work in connection with the acquisition of the greater part of these peanuts had been completed and the peanuts paid for. Defendants do not deny liability as to these peanuts at the sheller contract price. On the balance the paper work had not been completed nor had the purchase price been paid to Commodity Credit Corporation. As to the peanuts that fall in this latter class defendants contend that Greenwood Products Company's liability to plaintiff does not exceed the amount paid the growers for these peanuts.

The controversy between the parties on this issue grows out of an amendment to the sheller contract after the contract became effective. The original contract (paragraph 8) required the sheller to repurchase peanuts for his own account until his allocation was exhausted before he could stockpile any of the peanuts for the account of the Commodity Credit Corporation. Paragraph 8, before it was amended, contained an expressed provision which placed the risk of loss on the sheller, at sheller prices, from the time the peanuts were purchased from the producer. See Pelham Oil and Fertilizer Co. et al. v. United States, 5 Cir., 173 F.2d 888. Amendment 1 to the sheller contract revised paragraph 8 to provide that the sheller, at his own election, could either repurchase the peanuts for shelling immediately after they were purchased from the producer or could stockpile the peanuts and delay the repurchase for shelling purposes until he was ready to shell them. This amendment was made solely for the benefit of the sheller to enable him to delay paying for the peanuts until he was ready to shell them. The amendment failed to carry forward the provision which expressly placed the risk of loss, at sheller prices, on the sheller.

The stipulation shows clearly that these peanuts were destroyed by fire while in the possession of Greenwood Products Company, as purchaser or with rights to purchase, under certain provisions of the contract between the parties, and under the circumstances and conditions necessitating its execution the court holds that Greenwood Products Company is liable to plaintiff, at the price it agreed to pay Commodity Credit Corporation for all peanuts held by it under its allocation rights under the contract.

The failure to carry forward the risk of loss provision in paragraph 8 of the contract did not change the liability of Greenwood Products Company, because under the law of Florida, where the buyer takes possession of goods, as purchaser, even though title is reserved in the vendor to secure the purchase price, the risk of loss is in the purchaser. Phenix Insurance Co. v. Hilliard, 59 Fla. 590, 52 So. 799, 138 Am.St.Rep. 171.

The reason for paragraph 8 originally containing the express provision, which placed the risk of loss on the sheller from

the time the peanuts were purchased from the producer, arose out of the fact that the contract was prepared for use and was used in all peanut-growing areas in the United States and in some of the States (Georgia, for example) the purchaser could not be held liable where the vendor retained title. Therefore, when the general contract, used uniformly everywhere, was amended to specifically aid a single company in Florida it was unnecessary to carry forward the express provision placing the risk of loss on the purchaser, as the law of Florida placed it there anyway.

### Stockpile Peanuts.

The provision requiring Greenwood Products Company to carry insurance on stockpile peanuts (paragraph 6(e)) reads as follows: "(e) *Company's Liability*. The Company shall, at its own expense, insure all stockpile peanuts, for an amount equal to the aggregate purchase price thereof determined in accordance with Exhibit 'B' hereof, with such companies and under such policies as Commodity may approve against risk of loss or damage by fire, water, lightning, windstorm, flood, tornado and rain. * * *".

The Exhibit "B", referred to in this provision, is the price at which peanuts were sold by Commodity Credit Corporation to shellers. Greenwood Products Company held only a sheller contract, therefore, its obligation under this provision was to carry insurance on all stockpile peanuts stored by it equal to the price fixed by Commodity Credit Corporation for the purchase of such peanuts by shellers.

There is no doubt but that the Commodity Credit Corporation had an insurable interest in the difference it paid for these peanuts and the amount it charged shellers therefor. The stipulation of facts in this case shows that the Commodity Credit Corporation paid growers a uniform top price of $150 per ton for Spanish peanuts and $140 per ton for Runner peanuts. It sold such of these peanuts as it allocated to shellers for a price in excess of the price paid the farmers, but it sold the peanuts allocated to crushers for $92.60 and $87.10 per ton. Therefore, the government sustained a sub-

stantial loss on all peanuts allocated to crushers. The crusher contract obligated crushers to carry insurance at the price the crushers paid Commodity Credit Corporation for the peanuts. The court finds no legal objection to this overall arrangement and holds that the provision in the sheller contract requiring shellers to carry insurance at the rate the sheller paid Commodity Credit Corporation for the peanuts is neither arbitrary, unreasonable nor illegal. The court holds that plaintiff is entitled to recover the price charged shellers for all peanuts stockpiled by Greenwood Products Company for the account of Commodity Credit Corporation.

A Final Judgment will be entered in conformity with this Memorandum Decision.