## CLAYBOURN CORPORATION v. CUNEO PRESS, Inc.

No. 41918.

District Court, N. D. Illinois, E. D.
April 8, 1939.

Kirkland, Fleming, Green, Martin & Ellis, of Chicago, Ill., and J. Fred Reeve, of Chicago, Ill., for plaintiff.

Campbell, Clithero & Fisher, of Chicago, Ill., and Delbert A. Clithero, of Chicago, Ill., for defendant.

WOODWARD, District Judge.

This case was once tried before a jury. A judgment was entered on the verdict for the plaintiff, from which judgment an appeal was taken. The cause was reversed with directions to grant a new trial. Cuneo Press v. Claybourn Corporation, 7 Cir., 90 F.2d 233.

After the case was remanded to the District Court the plaintiff filed an amended complaint. By its amended complaint the plaintiff averred that on April 8, 1931 the plaintiff and defendant entered into a written contract which is hereinafter more particularly referred to. The complaint further averred that the written contract was modified by an oral agreement entered into by the parties in April, 1932. After the alleged modification in April, 1932 the presses were delivered to the defendant and retained by it. The plaintiff seeks to recover the contract price of the presses, together with interest thereon, less certain amounts advanced to plaintiff by the defendant and less certain amounts due by the plaintiff to the defendant on a promissory note.

To this complaint the defendant filed an answer in substance denying that the contract of April 8, 1931 was modified and insisting, by way of recoupment, on damages for breach of warranty.

By stipulation a jury was waived and the cause submitted to the Court for trial.

Evidence was heard by the Court, the cause was argued both as to facts and as to law, orally and in writing, and the matter now comes up for decision.

Plaintiff, a Wisconsin corporation, in 1931 and for several years prior thereto, was engaged in the manufacture of printing presses in Milwaukee, Wisconsin. The defendant, an Illinois corporation, during the same period, was engaged in the printing business in Chicago with branches, or wholly owned subsidiaries, located at various points, among others, a plant in Brooklyn, New York.

A contract was entered into by which the plaintiff was to manufacture, sell and deliver, and the defendant was to buy two printing presses. This contract is evidenced by two letters dated, respectively, April 1, 1931 and April 8, 1931. So far as material to this controversy, the contract may be summarized as follows:

The price of each press was $42,000. Each press was guaranteed to run at a maximum speed of not less than 5500 sheets per hour, with a guaranteed production speed of 4200 sheets per hour of good commercial printing, equal to work then being produced on flat bed types of presses which were then utilized in the printing of Harper's Bazaar magazine at defendant's Brooklyn plant. The presses were to be erected and tested on plaintiff's floor in Milwaukee before shipment and should be subject to inspection by representatives of the defendant, after which they should be crated, loaded on cars and shipped to designation specified by the defendant f. o. b. cars Milwaukee. Plaintiff was to begin shipment about five or six months after the date of the contract. Twenty-five per cent of the purchase price of each press was to be paid when the press was fully erected, tested and inspected on the floor of plaintiff, and the remainder was to be paid after the presses, installed, had attained the speed and quality guaranteed.

Pursuant to the contract the plaintiff proceeded to construct the presses. It had not proceeded far with the construction until it became apparent to the plaintiff that the presses would not attain the speed guaranteed in the contract. During the summer or fall of 1931, at least before the time specified in the contract for the delivery of the presses, the fact was communicated to the defendant that the presses would not operate at 5500 sheets per hour. However, the plaintiff continued with the construction of the presses. During the fall of 1931 and the winter of 1932, conversations were being had between the representatives of the plaintiff and those of the defendant, the purport of which was that the presses would not meet the guaranteed speed. In the meantime the presses had not been delivered, nor were they completed ready for shipment.

Before April 25, 1932 the Brooklyn plant of the defendant had been moved to Philadelphia, Pennsylvania.

On or about April 25 or 26, 1932 a conference was held in the Chicago office of the defendant. Present at that conference were Albert H. Halstead, Jr., and L. W. Claybourn, representing the plaintiff, and John F. Cuneo and J. F. Snyder, representing the defendant.

As the Court understands the testimony of the witness who participated in that conversation, there is no substantial disagreement as to its purport. The plaintiff knew that it could not construct presses which would operate with the speed and quality specified in the original contract of April 8, 1931 and had communicated to the defendant the fact of its inability to comply with the contract. Both the plaintiff and the defendant, the officers of each being experienced and competent business men, knew that the failure of the plaintiff to deliver presses which would meet the guaranty of the contract of April 8, 1931, would subject the plaintiff to damages, probably in a very substantial sum. Up to that time the relations between the parties had been amicable. The plaintiff at that time was, and for many years previous thereto had been, a large and substantial manufacturer of printing presses and machinery used in connection with printing plants. The defendant operated a large printing plant in Chicago and printing plants elsewhere and had been a valued customer of the plaintiff, had large contracts for printing which required printing presses which would operate with speed and efficiency. Having been apprised that the presses contracted for by the contract of April 8, 1931 could not be made to operate at the guaranteed speed, a conference was held in the office of defendant's president at Chicago to discuss the subject matter of the contract of April 8, 1931 in view of the facts as both parties knew them to exist.

What transpired at this conference between the responsible officers of each company is the crucial point of this lawsuit.

Both Halstead and Claybourn testified that there was some conversation about damages which the defendant had sustained, or had sustained by reason of the presses not being able to come up to the guaranty. Both Claybourn and Halstead testified that Cuneo said that he could sue the plaintiff for damages, to which the response in substance was that if that were the situation there would be no reason for further conversation. That the subject of damages was discussed is not denied by Cuneo. Whether that happened or not is, so far as the Court views the situation, immaterial. The fact is, however, that Cuneo was in an advantageous position to have made such a statement. The conversation; however, according to Halstead's testimony, was resumed and Cuneo was advised that the presses had been running 2400 to 2800 sheets an hour. Halstead further testified that the plaintiff did send the presses to Philadelphia on approval. He stated that he said to Cuneo: "If you do not like them (referring to the presses) you can return them and we will refund your money." (Rec. p. 85.)

The record further shows that Halstead stated: "I said we would do the best we could to get as good quality of production as possible and, if he didn't like them, (the presses) he could send them back."

He further stated that Cuneo said: "All right, get them down to Philadelphia as fast as you can." (Rec. p. 86).

Claybourn testified that he told Cuneo in that conversation that the plaintiff had not been able to bring the presses up to the speed called for in the contract; that 2600 to 3000 was the best speed the plaintiff could get out of the presses at that date. The substance of Claybourn's testimony is found on page 131 of his deposition wherein he said: "Well, we would ship the presses to Philadelphia. We would let them stand on their own merits. If they didn't meet up to what he wanted to pay the full price for those presses at that time after they were tested on their floor in actual experience in their plant we would take them back and give him his money back, and Mr. Cuneo turned around, 'All right, go ahead and ship them. How soon can you do it?' I said 'immediately'".

On direct examination Cuneo gave the following interpretation:

"A. Well, of course, I don't remember everything that happened. That is a long time ago. But, the gist of what happened is this: Mr. Claybourn did most of the talking and he stated that he had one of the presses now erected on his floor at the Claybourn factory and that it was a very fine press, that it was a sturdy press and a good looking press, that it was a good printer, that it had a good printing impression, but he had run into one trouble and that was that he was not able to get the press up to the speed as specified in the contract but that he did not think that was due to the press as much as it was to the condition that he was trying to print under, that the press was erected in a machine shop where it was cold and drafty and that he could not get the ink to flow right, and the rollers—on account of the variation of temperature they would not stay at their right—well, I guess the word is 'elasticity',—

"Q. That is the ink rollers? A. That is the ink rollers.

"Q. I see. A. And that due to that he felt that was the reason the press was not coming up to the contract speed. And Mr. Claybourn, I asked him how far behind the speed he was able to get the press to produce. I mean by that, the contract speed.

"Q. Yes. A. And he said about 20 per cent. Then I think I told Mr. Claybourn the delay was very costly to us, that we were producing Harper's Bazaar magazine, which we had bought these two presses for, on Miehle presses, printing in sixteen-page forms and that he had contracted to give us a press that would print in thirty-two page forms at a production speed of about 4200 an hour, and that it was very costly and the loss was accumulating.

"Mr. Claybourn said, 'That is really what I am down here to see you about. I want to change the testing place that is called for in the contract to your pressroom rather than make the test in our machine shop because in your pressroom we would have the proper temperature, we would have pressmen, the work would have the proper supervision, paper would be at the right temperature, and what I wish you would do is to change the contract to make the testing floors Philadelphia rather than our machine shop in Milwaukee.'

"Then I think I brought up the question that this would involve paying freight to Philadelphia, that I did not feel like paying freight on a press that was not up to the contract speed, admittedly so by the manufacturer. He said, 'Yes, but your contract says you are to pay the freight anyway, and I am certain if I get them to Philadelphia you will be well satisfied with the presses.'

234

"I think I then turned to Mr. Snyder and asked his opinion of the matter and I believe Mr. Snyder said, 'Well, I do not see how we can lose much. The delay is very costly'".

On cross examination Cuneo was asked this question: "In the conversation of April, 1932, did Mr. Claybourn say that the Cuneo Company would get that 20% back, would get whatever loss we sustained if the presses did not satisfy us. The Claybourn Corporation would pay it back to us. It was an advance. If the presses were not right, they would return us this money? A. I don't remember it just that way, Mr. Reeve, but I do think something was said about giving us the advance back if the presses did not work."

On the former trial Cuneo admits that he stated: "I think what was said was, at least what I understood was, we would get that 20% advance back, we would get whatever loss we sustained if the presses did not satisfy us. The Claybourn Corporation would pay it back to us. It was an advance. If the presses were not right they would return us this money."

Cuneo further says: "I said substantially that way." (Rec. pp. 549, 550.)

Further on cross examination of Cuneo the record shows:

"Q. Well, when Mr. Halstead or Mr. Claybourn told you in your office that the money, the advance payments would be returned to the Cuneo Company if the presses were not satisfactory what did you say? A. I don't recall that he just—my recollection of that is that that was more of an inference, that naturally if the presses did not work you would get your money back. I can't say positively that he said that. But I think the inference of the whole thing was that if they did not work naturally you would get your money back.

"Q. That was the understanding, wasn't it? A. Well, it was a sort of—that was the inference I drew from it, but I don't recall his making any definite statement about it.

"Q. That if you did not like the presses, you would get your money back? A. No, not if I did not like the presses. It was not a question of liking. It was a question if the presses were not working properly, the inference would be I would get the advance back.

"Q. That was in your mind when you were talking to them that day? A. I think so." (Rec. pp. 550, 551.)

Again Cuneo was asked this question: "The understanding that you got from the conversation with Mr. Claybourn and Mr. Halstead was that if those presses were not satisfactory you would return them to Claybourn and get your money back?" To which Cuneo made answer: "That is right." (Rec. pp. 551, 552.)

And again, "And Mr. Claybourn and Mr. Halstead said that if they were unsatisfactory to you they would take the presses back and give you your money back? A. I am not sure they said that, but I inferred that from the conversation." (Rec. p. 552.)

As stated, both parties knew that the presses being constructed in plaintiff's plant would not meet the guaranty of the contract of April 8, 1931. Both parties knew that the defendant was in position to demand and to recover damages for breach of the warranty of that contract. It is inconceivable that in view of the admitted facts the plaintiff, whose officers were experienced prudent business men, would agree to ship presses for which they would incur damages in a substantial amount. Furthermore, Cuneo was, in that conversation, lead to believe that, while the presses would not operate at the speed guaranteed in the contract of April 8, 1931, yet that the presses could be made to operate with efficiency and at a speed and quality which would be satisfactory to the defendant.

Under the admitted facts and circumstances in evidence, together with the testimony of the witness who participated in the April, 1932 conference in Cuneo's office, the Court cannot escape the conclusion that the contract of April 8, 1931 was modified. By the modified contract, damages for the breach of the warranty in the contract of April 8, 1931 were waived, the presses were to be sent to defendant's Philadelphia plant on approval and, if the presses were not satisfactory to the defendant, the presses might be returned to the plaintiff, whereupon the plaintiff would refund to the defendant the advance payment which it had received. The Court finds as a fact that the contract of April 8, 1931 was modified as herein stated.

That there was a consideration for the modification of this contract is settled by the case of Cuneo Press, Inc. v. Claybourn Corporation, 7 Cir., 90 F.2d 233.

Under the original contract of April 8, 1931 the defendant obligated itself to pay the plaintiff 25% of the purchase price of each machine when the press was fully

erected, tested and inspected on the floor of plaintiff's plant. At the April, 1932 conference the subject matter of the payment of 25% was discussed. There is a disagreement in the testimony as to whether, under the modified contract, the advance payment should be 25% or 20%. At any rate shortly after the April, 1932 conference the defendant sent the plaintiff four voucher checks aggregating $16,800, on the back of each check the following endorsement being made:

"Demand advance to Claybourn Process Corp. The Cuneo Press, Inc. to be entitled to apply same on any amounts which may become due on presses.

"This Advance waives no conditions of contract for presses, presses to be forwarded to Philadelphia and tests made there instead of Milwaukee."

The checks were received by plaintiff, endorsed by it and cashed. It is contended that the receipt and endorsement of these checks demonstrate conclusively that in the April, 1932 conference no conditions of the April 8, 1931 contract were waived except that the tests were to be made in Philadelphia and not in Milwaukee. With this contention the Court cannot agree. In the opinion on the appeal in this case the Circuit Court of Appeals says: "Nor can we accede to the suggestion that such modification as came about was entirely reduced to writing, and that, therefore, parol evidence was improperly admitted as to the conversations. Appellant relies, in this respect, upon the language upon the back of two checks given for advancements, to the effect that the performance of the contract for delivery of the presses was not waived but that the place for testing was changed. Below this language appellee placed its endorsement. But the statement fails to disclose to what contract the language has reference. It is left uncertain as to whether the original contract or the contract as modified was indicated. The checks were given subsequent to the alleged modification, and appellant, according to the testimony, regarded the language as referring to the modified contract and not to the original contract. There being ambiguity in the language, we think the court would not have been justified in holding, as a matter of law, that the contract of modification was reduced to writing." 90 F.2d 233, 237.

The endorsements on the checks fail to disclose to what contract the language had reference. It is uncertain whether the language refers to the original contract of April 8, 1931 or to the contract as modified in the conference of April, 1932. While the Circuit Court of Appeals held as a matter of law that parol evidence was admissible as to the conversations, this court, on this trial, holds as a matter of fact that the language on the voucher checks referred to the contract as modified by the conference in defendant's office in April, 1932.

After the April, 1932 conference the plaintiff borrowed of the defendant $5,000 and gave its promissory note therefor in that amount dated January 8, 1933, due thirty days after date with interest thereon at the rate of 6% per annum from date until paid. This note has been renewed and is still the obligation of the plaintiff, together with interest thereon at 6% per annum from January 8, 1933.

The first press was shipped to Philadelphia sometime in May, 1932. It was then erected and the first attempt to operate it was made in July, 1932. Defects in the press were discovered and attempts were made to remedy them. In October, 1932 an attempt was made to print Harper's Bazaar magazine on the press, but it was unsuccessful and the work had to be taken off the press and put on flat beds in order to get the magazine out to meet the publication date. Another attempt was made in November, 1932 to print Harper's Bazaar magazine on the press and a portion of the magazine, estimated at about 25% of the December issue, was produced on the press and the balance of the job had to be finished on other presses.

The second press was shipped in July, 1932, but was not erected nor was any attempt made to operate it until December. In December, 1932 a part of the Burpee seed catalog was printed on these two presses and in January, 1933 the Naule seed catalog was entirely printed on these presses. From the time the presses were shipped and until January or February, 1933, attempts were made, not wholly satisfactory, to make the presses work both with speed and efficiency. The tests of the presses uncovered many defects and efforts were made by plaintiff's employees to remedy these defects, but without satisfactory results. The evidence, however, shows that in the months of January and February, 1933 the presses had begun to operate with more efficiency. However, at no time did the presses operate either with the speed or quality guaranteed in the contract of April 8, 1931.

Letters passed back and forth and conversations were had from time to time relative to the efficiency of the presses, finally culminating in a letter written by plaintiff's attorney under date of February 2, 1933 to the defendant going somewhat at length into the controversy and stating the understanding of the plaintiff relative thereto, and stating in part: "At the expiration of 10 days from the date of receipt hereof, we intend to make a formal tender to The Cuneo Press, Inc., of Chicago, Illinois, of the sums of money heretofore paid by the Cuneo Press on account pursuant to the oral agreement above referred to, and also of the sum represented by a certain note signed by the Claybourn Process Corporation in the sum of $5,000, together with any accrued interest, and at the same time we intend to make a formal demand upon The Cuneo Press of Chicago and The Cuneo Eastern Press, Inc., of Pennsylvania, for the return of both presses."

On February 13, 1933 counsel for the defendant addressed a letter to counsel for plaintiff in response to the letter of plaintiff's counsel of February 2, 1933, in which it is stated: "Our client has elected to keep the presses and maintain its action for damages suffered. It is doubtful if they are worth much more than junk value, however, and if your client really wants them they will be returned on payment of a fair allowance for the damages suffered, and on repayment of the money our client was induced to part with in order to get delivery of the presses."

After its election to keep the presses, the defendant continued to use the presses for the completion of the Naule seed catalog. Admittedly the presses were kept in operation until February 21, 1933. The defendant retained the presses to the date of the filing of the amended complaint and indeed now retains the presses which are dismantled, boxed and in a storeroom in defendant's plant at Philadelphia.

Having found as facts that the original contract of April 8, 1931 was modified at the conference in April, 1932 in the particulars hereinabove set forth; that by its letter of February 13, 1933 the defendant elected to keep the presses; and that the defendant actually kept the presses and used them after its election so to do and made no offer to return the presses until the filing on January 9, 1939 of its answer to plaintiff's amended complaint, what is the legal situation growing out of this statement of facts?

■ Both the original contract and its modification are governed by the Illinois law. The rights of the defendant are clearly set forth in the Sales Act of Illinois, the applicable provision reading as follows: "Where the buyer is entitled to rescind the sale and elects to do so, the buyer shall cease to be liable for the price upon returning or offering to return the goods. If the price or any part thereof has already been paid, the seller shall be liable to repay so much thereof as has been paid, concurrently with the return of the goods, or immediately after an offer to return the goods in exchange for repayment of the price." Section 69(4), Ch. 121½, Ill.Rev.Stat.1937, State Bar Ass'n Ed., the same being Sec. 69(4) of the Illinois Sales Act.

■ Under the facts as found by the Court, the presses, if not satisfactory, might be returned by the defendant. Concurrently with the return of the presses, or offer to return the presses, the obligation of the plaintiff arose to return to the defendant the amount advanced on the purchase price. Under the contract as established by the evidence, the defendant had the right of rescission. The right to rescind must have been exercised within a reasonable time. Admittedly the plaintiff never did elect to rescind within a reasonable time, and never did return the presses, or offer to return them, until its formal offer in the answer to the amended complaint filed in January, 1939. The obligation of the plaintiff to repay the down payment never arose. Such obligation of repayment, under the Sales Act, arises only "concurrently with the return of the goods, or immediately after an offer to return the goods in exchange for repayment of the price."

■■ Admittedly the offer in the letter of February 13, 1933 did not conform to the statute and did not constitute an offer to return the presses in such a way as to create a concurrent liability on the part of the plaintiff to refund a part of the purchase price already paid. The offer was coupled with a demand for the payment of damages. Under the statute if the defendant returned the presses the concurrent obligation of the plaintiff then arose to repay so much of the price as it had received. The law, however, does not allow the buyer to retain the goods, bring its suit for damages,

rescind the contract and recover back the amount already paid on the purchase price.

The defendant retained the presses for a period of six years. The evidence fails to show that the presses were either returned or offered to be returned. The offer to return the presses was coupled with an illegal demand for the payment of damages. The plaintiff was justified in ignoring this offer.

█ When a purchaser is entitled to one remedy for breach of warranty he can have no other. Section 69(2), Ch. 121½, Ill. Rev.Stat.1937, State Bar Ass'n Ed., the same being Sec. 69(2) of the Illinois Sales Act, provides: "When the buyer has claimed and been granted a remedy in any one of these ways, no other remedy can thereafter be granted."

Aside from the letter of February 13, 1933 the defendant never offered to return the presses until its formal offer in the answer to the amended complaint filed in 1939. It never did return the presses.

Plaintiff's letter of February 13, 1933 is predicated on the premise that the contract of April 8, 1931 was in full force and effect and not modified in the conference of April, 1932. The premise being false, the conclusion must fall.

█ Defendant elected to retain the presses and thereby to pursue the remedies authorized by the Illinois Sales Act. Having elected this remedy he is entitled to no other. The Illinois Sales Act provides: "When the buyer has claimed and been granted a remedy in any one of these ways (the ways provided in the section), no other remedy can thereafter be granted." Section 69(2), Ch. 121½, Ill.Rev.Stat.1937, State Bar Ass'n Ed., the same being Sec. 69(2) of the Illinois Sales Act.

█ It follows from what has been stated that the plaintiff is entitled to recover the contract price of the presses, that part of the original contract not having been modified in the conference of April, 1932. The plaintiff also claims that it is entitled to interest on the unpaid purchase price. This claim must be denied. The contract relied upon in the amended complaint is partly oral and partly written. Interest is not allowable on such a contract. Railway Passenger & Freight Conductors' Benefit Association v. Tucker, 157 Ill. 194, 42 N.E. 398, 44 N.E. 286.

The original purchase price of the two presses was $84,000, and the plaintiff is entitled to recover this sum for which the defendant became obligated. From the sum of $84,000, however, must be deducted the following: (1) $16,800, being the amount already paid on account of the presses; and (2) $5,000, together with interest thereon at the rate of 6% per annum from January 8, 1933 to the date of the entry of the judgment.

A judgment order may be presented which conforms with the conclusions stated in this memorandum.