**LAND O'LAKES CREAMERIES, INC.,**
**Plaintiff,**

v.

**COMMODITY CREDIT CORPORATION,**
**Defendant.**

**4-58-Civ.-450.**

United States District Court
D. Minnesota,
Fourth Division.

July 18, 1960.

414

Doherty, Rumble & Butler, by Harold Jordan, St. Paul, Minn., for plaintiff.

John J. Connelly, Asst. U. S. Atty., St. Paul, Minn., for defendant.

DEVITT, Chief Judge.

Plaintiff sues for $30,834.57, the unpaid balance on the price of dried milk sold to defendant. Defendant counterclaims for the same amount on the basis of an administrative board determination that some of the dried milk was infested with insects and that the defendant had properly rescinded part of the sales. The issue is whether to uphold the decision of the Board and thus to allow the defendant's setoff.

The contracts of sale between Land O'Lakes and Commodity Credit Corporation (hereinafter called "C.C. C."), provided for the submission of disputes to the contracting officer of the C.C.C. and appeals to the Contract Disputes Board of the C.C.C. Resulting decisions are binding subject to these limitations:

" * * * any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

"No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board." Chapter 199, §§ 1, 2, 68 Stat. 81 (1954); 41 U.S.C.A. §§ 321, 322.

The parties agree that the issues are whether there is substantial evidence to support the Board's finding of insect infestation at the time of delivery and whether the Board made any errors of law in finding that C.C.C. was entitled to the $30,834.57.

The facts in this case are somewhat difficult to assimilate because they involve 25 carlots of dried milk purchased under 22 contracts over a period of 4 years from five of the plaintiff's plants, and shipped to various warehouses where inspections were made at varying times. The Court has prepared a chart summarizing the shipments, dates, contract numbers, etc., and has appended it to this memorandum in order to summarize the essential items in following statement of facts.

Originally in dispute were 25 carlots of dried milk. The Contracts Disputes Board determined that insect infestation was present at time of delivery in 22 of them, but that as to 7 cars there had been no timely notice of rescission by C.C.C., and as to 1 car a prior inspection should have revealed infestation, so that the C.C.C. was entitled to recovery only on the remaining 14. These 14 are the only ones we are concerned with here, but it is still necessary to occasionally discuss the other carlots for a complete understanding of the facts.

In a several-week period during the spring of 1953, the defendant purchased 7 allegedly infested carlots from the plaintiff's Dresser, Wisconsin plant, and in the spring of 1955, 13 carlots from the plaintiff's Lake Crystal plant; 5 other allegedly infested carlots were purchased

from other plants of the plaintiff, but are not now pertinent.

Since the carlots were shipped to various warehouses, infestation was discovered at different times. The Board found that as to 4 of the 7 Dresser cars, no timely notice of rescission had been given, that 1 Lake Crystal car was not infested at time of delivery, and that C.C.C. had waived recovery by not discovering infestation earlier in another. Liability thus was attached on only 3 Dresser cars, and on 11 Lake Crystal cars, which are the 14 cars in dispute here.

### I. Substantial Evidence

The first issue is whether the findings of insect infestation at the time of delivery is supported by substantial evidence. We must review the record as a whole in determining this question. It is necessary to consider a brief synopsis of the essential facts and inferences relied upon by the Board. These are that (1) subsequent to the time of delivery at the plaintiff's plants, inspections of the product at various government warehouses revealed insect infestation; (2) the plaintiff's plants were then inspected and found to contain evidence of insects; (3) the inference was drawn on the basis of the government expert's opinion, that the milk was infested at the time of delivery. The plaintiff attacks the Board's right to draw such an inference on multiple grounds.

### A. Evidence of Insect Infestation at the Warehouses

First, the plaintiff urges that as to 9 of the carlots out of the 14 involved herein, there is no substantial evidence of insect infestation even at the government warehouses, because as to these 9 carlots, each involving about 200 barrels of dried milk, the inspectors found only 1 infested barrel of dried milk in each carlot.[1] The plaintiff then concludes that this is insubstantial evidence to support a breach of warranty by relying on the C.C.C.'s

own letter [2] from the Pure Food & Drug Administration, to the effect that such evidence alone would not be enough to condemn the entire carlot as unfit for human use:

"2. Your second question is whether we would consider the presence of insect infestation in only one container in a carload as warranting condemnation for human food use of the entire carlot.

"Although we are not certain that we fully understand your system of sampling, answering your specific question in a general way we would not be willing to charge a violation of the Food, Drug, and Cosmetic Act on the basis of a finding of insects in only one container in this amount of food, since on the basis of that finding alone we would be unable to judge whether such contamination was merely accidental or truly represented infestation of the goods sampled. In judging the legal status of any lot based on infestation we first of all would want a representative sample from each of the lots in the car and would also take into consideration the history of the material and sanitary conditions surrounding its storage at any point where it was held subsequent to manufacture."

But the plaintiff's contention fails to recognize that the other factors mentioned in the letter were present and considered by the Board. The isolated fact that only 1 barrel per 200 was found in 9 carlots, is misleading. As shown by the charts, the discovery of 1 barrel in each of 9 cars resulted from carlot samplings of from 1 to 41 barrels. In other carlots, shipped at about the same time, the sampling revealed higher ratios of the number of infested barrels to the number sampled. The Board was entitled to treat the individual carlots as part of two manufacturing outputs, one

---

1. As to the remaining 5 cars, the plaintiff does concede there was substantial evidence of insect infestation because in

each of these, more than one infested barrel was found.

2. Presented as part of the government's case.

from Dresser and one from Lake Crystal, in finding as they did that:

"In each case where insect infestation was detected, the extent of samples examined was sufficient to determine that the entire carlot involved was infested."

■ To breach the warranty in a case such as this, it is not necessary that each and every barrel be found infested, but only that enough infestation be found throughout the shipments to conclude as a practical matter that the totality of the goods was unfit for human consumption.

B. Evidence Supporting the Inference That the Infestation was Present at the Plants at Time of Delivery

The plaintiff contends that regardless of the sufficiency of evidence showing infestation at the government warehouses, there is insufficient evidence in general for the Board to conclude it was present at the time of delivery because: (1) a government inspection was made at time of delivery, which revealed no infestation of the plant or product; (2) the warehouse inspections were not made until several months later at widely scattered warehouses after the carlots had been subjected to possible infestation from railroad boxcars; (3) the nature of the insects, which were beetles, precludes them from having been present at time of delivery because of (a) their inability to survive the heat at which the milk is produced; (b) their limited life cycle and inability to reproduce on a subsistence of dried milk; and (c) their penetration capacities in relation to the time element and the various positions at which they were discovered between the polyethylene liners, Kraft liners, and wooden barrels in which the milk was packaged.

The main source of knowledge about the beetles arises from an extensive six-month experiment conducted by government entomologists at Madison, Wisconsin to determine how the beetles get into dried milk, and how it could be packaged to prevent it. The written report of these experts and the oral testimony of the supervisor of these experiments was presented before the Board. It is unnecessary to summarize this evidence, except by way of showing that for every fact which tends to show the bugs could not have been present, the government points to an equally convincing fact tending to prove the opposite.

Although the plaintiff's expert was of the opinion that the infestation must have come from some place other than the plants, the government's expert was of the opposite view. Either view was supported by substantial evidence.

It is true that the C.C.C. inspected the milk at the plant prior to delivery. But the Board concluded from the testimony that this inspection was made for the purpose of determining grade and not for the purpose of discovering infestation, and that it is a practical impossibility to ascertain the presence of beetles in the larvae stage, and that they therefore could be present despite the inspection.

To the testimony that larvae could not survive the heat at which the milk was produced and packaged, the government replied with credible testimony that they could survive in the packaging despite the initial heat of the milk itself.

There was some testimony showing on one hand that the life cycle and reproduction capacity of the beetles on a diet of dried milk would extinct them in a period of two months—but there was also testimony that they could live on possibly for two years. So the Board could reasonably conclude that beetles found in the milk could have been present six months earlier in the larvae stage.

The six-month tests at Madison showed that some beetles will readily penetrate wooden barrels from the outside but will then ordinarily lodge between the Kraft paper and polyethylene liners, while if they start from the liners, some beetles will penetrate through into the milk. The plaintiff points to the fact that in the great majority of infested barrels, infestation was found only between the liners, to draw the inference that it is more probable that the infestation came from boxcars, or from the various ware-

houses, than from the factory. But the C.C.C. points out that as to 4 barrels from Lake Crystal and as to 1 carlot from Dresser, insects were found present in the milk itself, and that the experiments conclusively showed the beetles could not penetrate from outside the barrels into the milk in this length of time. The plaintiff's argument here, as throughout, implies that we must look at each carlot independently, and cannot impute the presence of bugs in the milk in one carlot to another carlot where the bugs were only lodged between the liners and did not reach the milk. But again, as in the Board's finding as to the adequacy of sampling, I think it was proper for the Board to consider the Lake Crystal cars and the Dresser carlots as two manufacturing outputs showing a pattern of infestation as revealed in subsequent inspections of the individual carlots. That any single carlot had less evidence of infestation than others does not eliminate it from consideration unless it has no probative connection with the pattern. The plaintiff nevertheless maintains that the specific evidence as to the Lake Crystal and Dresser shipments, considered in light of the experimental knowledge, was insufficient to support a conclusion that infestation was present at time of delivery.

C. The 1953 Dresser Shipments

Between May 14 and July 2, 1953, 29 carlots of milk were shipped from the plaintiff's Dresser, Wisconsin plant to 14 different warehouses. Of the 29, 7 were found to be infested upon an inspection approximately 6 months later, 3 in Williams Warehouse in Minneapolis, 3 in Rock Island Warehouse in Minneapolis, and 1 in Interstate Warehouse in Kansas City. Four different species were found, but all 7 carlots contained some beetles of the species, *Trogoderma inclusum*. The 3 warehouses were also found to be infested, but none with *Trogoderma inclusum*. However, 1 warehouse and the Dresser barrels within it, were found to be infested with a common species, *Attagenus piceus*. It was an established fact that the species could not cross-breed. Immediate inspection of the Dresser,

Wisconsin plant revealed evidence of insect infestation in the ceiling of the rooms where the empty barrels and liners were kept, and in the ceiling of the warehouse where the barrels of milk were stored. However, specimens of these insects were lost in the mails, so that their species was never determined. These basic facts were parlayed into an opinion by the government's chief witness, Dr. Lyman S. Henderson, the entomologist who had conducted the Madison experiments, that the infestation of the 7 carlots had originated from the Dresser plant:

"By Mr. Shouse:

"Q. Dr. Henderson, you have been shown certificates with regard to lots of milk delivered by Land O'Lakes Creamery Company which were manufactured at the Rock Ridge Cooperative Dairy Company at Dresser, Wisconsin.

"There were seven such lots delivered to the Government and, as was disclosed in the testimony yesterday, the specimens from the manufacturing plants involved were mailed to the Agricultural Marketing Service for identification, but unfortunately, lost in the mail.

"The lots, involved, however, were shipped from Rock Ridge Dairy Cooperative to three different warehouses in such widely separated States as Kansas and Minnesota from May to July of 1953.

"All of these lots were found infested with Trogoderma although no warehouse was found to be infested with Trogoderma. On the basis of this data and any other data which is before you and to which you refer, upon the basis of which the contracting officers made their determinations and any additional data which are known to you and not known to the contracting officers, can you express an opinion with regard to the source of the infestation?"

"A. Because of the fact that we do not have an identification on the insects that were found in the plant, if this set of lots standing by them-

selves were to be considered, it would be plainly evident that no conclusion could be reached.

"By virtue, again, of our observations on other conditions and parallel circumstances and in view of the series of facts as stated by Mr. Shouse in the question, it seems to me that this group of shipments falls into a similar or identical pattern with other cases which we will see, and that using that supplemental information we can assume that here, again, the infestation could very well arise even at the plant.

"I think it only fair to repeat again at the end of this that because of the fact that the insects were lost in the mails, it would not be at all reasonable to arrive at any conclusion without making parallel considerations."

"Q. Having made parallel considerations, Dr. Henderson, would you express the opinion that this infestation did occur at the plant?"

"A. I feel that it did."

Plaintiff objects strenuously that the hypothetical question did not embrace all the factors, i. e., that these were part of a 29-car shipment which went to 14 warehouses, that all 3 warehouses were infested, and that 4 species of insects were discovered. But it is not apparent that the plaintiff pointed out this objection at the time, and it appears that Dr. Henderson was not unaware of these facts when he gave his opinion. I cannot agree that Dr. Henderson's opinion was so unsupported by evidence and rational inference that it must be treated as incompetent. The opinion itself was some substantial evidence upon which the Board could rely.

D. The Lake Crystal Shipments

Between April and July, 1955, 28 carlots of milk were shipped from the plaintiff's Lake Crystal plant. Thirteen of these carlots were ultimately found to have been infested at delivery by the Board, but the C.C.C. was denied recovery as to 2 of them because a prior inspection should have revealed infestation in 1 carlot and another carlot did not contain the same species of insects as those found in the Lake Crystal plant. The evidence discussed by the parties relates only to the 11 remaining carlots from Lake Crystal.

These 11 carlots were all shipped from the Lake Crystal plant to a warehouse in Cedar Rapids, Iowa. Seven of the carlots were then shipped to Chicago. Inspections were made October 6–11, 1955 of these 7 shortly after delivery in Chicago; the 4 carlots remaining in Cedar Rapids were inspected on October 10, 1955.

The inspections showed that all 11 carlots contained *Trogoderma inclusum*, and *Trogoderma omatum*. *Attagenus piceus* was found in 6 of the carlots.

The Cedar Rapids Warehouse was inspected on October 10, but no infestation was found. The railroad cars used to ship the 7 carlots to Chicago were not inspected.

On October 7, 1955, the Lake Crystal plant was inspected and evidence of infestation was found in the ceiling of the storage room after the ceiling boards had been removed. The only insects identified were of the *Trogoderma inclusum* type. The Lake Crystal plant had been inspected previously on May 5, 1955 and August 31, 1955 and no infestation had been found.

The plaintiff argues that as to 7 of the 11 carlots, there was no substantial evidence of infestation because only 1 barrel was found infested in each carlot. This contention has already been rejected previously in this memorandum.

As to the other 4 carlots, the plaintiff urges that the evidence of infestation discovered at the Lake Crystal plant on October 11, 1955 was too insubstantial, in view of previous plant inspections and government approvals, to infer that plant infestation caused the product infestation.

A government inspector, Mr. Emerson Sevey, testified that the plants are thoroughly examined and inspected and that the milk in process and in storage is sampled in order to certify it "U. S. extra grade" before delivery. A head govern-

ment inspector testified that when infestation is found in the process of a current inspection, the powder on hand which has already been sampled and graded "U. S. extra grade," will still be accepted by the government.

From this testimony, the plaintiff establishes as his premise, that plant infestation alone is not proof of product infestation. Additionally, the plaintiff points out that 4 other species [3] were found in the product, but were not found in the Lake Crystal plant. He points to the fact that the national averages show that 80% of warehouse beetles are *Trogoderma inclusum,* to conclude that it was more probable that the infestation of the carlots by five species, including *Trogoderma inclusum,* came from some place other than the Lake Crystal plant, which contained only *Trogoderma inclusum.* Mr. Dawson, the plaintiff's expert entomologist, was of the opinion, on these facts, that the Lake Crystal plant infestation, in view of previous inspections, was too insignificant to impute it to the product manufactured up to six months before.

Mr. Dawson also thought that the insects in the 4 cars could not have originated at Lake Crystal because they were found to be alive at the warehouse inspections up to six months later.

The defendant in turn points to facts and testimony which substantially refute these inferences drawn by the plaintiff.

The government refers to the fact that in 4 of the Lake Crystal barrels, insects were found in the powder itself, yet from the government experiments, it was shown that the insects could not have penetrated into the milk if their starting place had been from outside the barrels, as the defendant suggests. The government also refers us to testimony that the life cycle of the larvae-beetle could be extended up to two years under adverse conditions, so that the fact that one of the beetles discovered inside the milk was alive is consistent with the inference that it was present at the plant in the larvae stage. The defendant emphasizes that the Lake Crystal plant was infested with the same bug as that found in all the infested barrels from Lake Crystal. It points out that not all the beetles discovered at the Lake Crystal plant were sent in for identification, and thus the presence in the barrels of species other than the *Trogoderma inclusum* does not preclude the inference that these others were also present at the plant. The defendant further points to the testimony of the government inspectors who said that infestation of the plant and product could exist despite their inspection and certification of the product as "U. S. extra" grade because the primary purpose of their inspections was not to discover infestation of the plant or product, but to determine the grade. Dr. Henderson also testified that the infestation coming from the plant storage area could be sporadic, thus explaining why no infestation was found in the other carlots shipped during the same period of time.

On the basis of these and other facts, I think there was sufficient substantial evidence for the government entomologist to express his opinion that the infestation discovered in the Lake Crystal barrels was present at the time of delivery. This opinion, in turn, even though in direct contradiction with that of the plaintiff's expert, constituted substantial evidence upon which the Board could rely.

I conclude that there is substantial evidence in the record to support the Board's findings.

II. Errors of Law

The plaintiff first contends that the Contract Disputes Board erred as a matter of law in finding that the defendant had made a valid rescission of the sales.

As to the 3 Dresser cars, purchased in June, 1953, the defendant wrote on March 8, 1954:

" *      *      *      *      *      *

3. Two of these species were found only in the 2 Lake Crystal carlots for which plaintiff was not held liable. This ex-

plains why only 3 species appear on the chart.

"This is to inform you that we received dry milk grading certificates No. IM–50573, 50562 and 50563 (copies attached hereto) showing that the above mentioned lots of dry milk to be insect infested. We also have a report from the Washington Office, Inspection and Grading Branch, Dairy Division, that inspection of the plant and facilities of Rock Ridge Dairy Coop., Dresser, Wisconsin, on November 2, 1953, revealed insect infestation in the rooms and area where the liners, empty barrels and barrels of non-fat dried milk solids were stored in the main plant and in the warehouse.

"In view of the foregoing it is our opinion that the lots of dry milk in question were insect infested at time of delivery.

"Therefore, *we request that you either (a) replace* the infested milk at a warehouse within Minneapolis, Minnesota, as designated by CCC, WITH NEW spray non-fat dry milk solids, evidenced as extra grade by an official grading certificate dated not more than 45 days prior to date of replacement, *or (b) refund* the purchase price of 14.00 per pound. *Upon our receiving evidence of replacement under option (a) or receipt of refund under option (b), the infested milk will be released for your account."* [Emphasis added.]

On March 12, 1954 the plaintiff replied by letter:

" *       *       *       *       *       *

"This product was manufactured at Rock Ridge in May 1953. The product was sampled by a U. S. Gov't. inspector and the product was graded Extra Grade by the U. S. Government Laboratory. The product was offered for sale to the U. S. Government under announcement DA101 in good faith. The product offered complied with the specifications as set forth in announcement DA101 in every way.

"Now an inspection was made at this plant in November 2, 1953 and found to be insect infested. We don't feel that this would be an indication that the plant was infested when the product in question was made. There are many places where insects could have gotten into the product beside the plant such as warehouses and box cars. In view of these facts *we do not feel that we should be held responsible for these claims."* [Emphasis added.]

The defendant then sold this milk at competitive bid price at 7.71¢ a pound, which was less than the price of 14¢ a pound at which it had been purchased from the plaintiff.

Concerning the 11 Lake Crystal cars, purchased in June, 1955, the defendant wrote on October 11, 1955:

"This letter is to confirm the telephone conversation of James V. Scala, Marketing Specialist, with you on October 10, 1955 regarding several car loads of milk purchased from you and manufactured by your Lake Crystal, Minnesota plant which was found to be insect infested.

"We have arranged for an inspection of all lots manufactured at your Lake Crystal plant present in CCC inventory and *this is to advise you of possible claim action against your company.*

"*In the event that it is determined that liability for infestation rests with your company the following alternatives will be presented to you:*

"(1) *This milk can be returned to your company through reimbursement to CCC of the purchase price plus costs as determined by CCC.* The additional costs are transportation and storage charges incurred by CCC from date of purchase.

"(2) *Replacement of powder* in equal number of pounds, covered by a grading certificate not older than forty-five (45) days, *at an approved warehouse to be designated by CCC."* [Emphasis added.]

This milk was then repurchased by the plaintiff at a competitive bid price of

·11.5¢ a pound, which was 4.5¢ less than the existing market price. The defendant wrote to the plaintiff on November 14, 1955:

> "Reference is made to Nonfat Dry Milk Solids, Spray process manufactured by your Lake Crystal, Minnesota plant and purchased by CCC.
>
> " * * * * * *
>
> "Subsequent USDA inspection of this milk indicated it to be insect infested. *Prior to our completing investigation to determine liability for infestation, this milk was sold for animal feed.*
>
> "This is to advise that in the event it is determined that liability for infestation rests with your company, it will be necessary to present a claim against your company for the difference between the market value at the time infestation was first discovered and the selling price." [Emphasis added.]

The defendant replied on December 1, 1955:

> "This is written in reply to your letter of November 14 regarding several lots of Spray process Nonfat Dry Milk Solids manufactured at our Lake Crystal plant and purchased by CCC.
>
> "*This is to advise you that we disclaim any liability relative to insect infestation on the lots as set forth in your letter.*" [Emphasis added.]

On January 16, 1956, the defendant wrote, stating that it had determmined that the infestation was present at the time of the delivery and that a claim was being made against the plaintiff for the difference between the market value at the time infestation was discovered, or 16¢, and the resale price of 11.5¢.

The Contract Disputes Board found as to the 3 Dresser cars:

> "CCC notified the petitioner of its· election to rescind the sale on the dates shown below: [March 8, 1954]"

As to the 11 Lake Crystal cars, the Board found:

> "CCC notified the petitioner of its election to rescind the sale on the dates shown below: [Oct. 10, 1955]"

Its general findings included:

> "CCC's right to recover damages in these appeals is based upon its rescission of the sale because of an alleged breach of an implied warranty that the milk was reasonably fit for the purpose for which it was intended, namely, human food
> * * * "

The Board further noted:

> "CCC assessed damages against the petitioner totalling $60,312.81 on the basis shown below:
>
> " * * * *
>
> "1. Difference between purchase price and price received from sale of the milk powder for animal feed [Dresser cars: 6.29¢ per lb.]
>
> "2. Difference between the market value of the milk powder at the time infestation was discovered and price received from sale of the milk powder for animal feed. [Lake Crystal cars: 4.5¢ per lb.]"

The Board approved this method of computing the claim as first determined by the contracting officer, and used it in granting its award. It does not appear that the plaintiff, on appeal to the Contract Disputes Board, contested the amount of damages as such.

It can be seen from these findings ·that the Board concluded that the plaintiff's March 8, 1954 letter and its oral telephone message of October 10, 1955, as contained in its letter of October 11, were valid notices of rescission.

The plaintiff disagrees with this finding of the Board on several grounds: First, that both notices are not unequivocal offers to cancel the contract and re-·turn the goods, since both propose the alternative courses of either replacing the goods or else refunding the purchase price. Second, that under either alternative offered by the defendant, there was still no unconditional offer to *return* the goods to the Dresser and Lake Crystal ·plants where title first passed, because

the Dresser notice offers only to "release" the milk, and the Lake Crystal notice, in addition, specifically makes demand for transportation and storage costs as a condition to return of the milk. The third contention of the plaintiff is that in no event could there have been a rescission of the Lake Crystal sales because the defendant had already resold the milk prior to determining that plaintiff had been responsible for the infestation, and therefore could not possibly have made an offer to return the goods, which is essential to the right of rescission.

In support of his theory, the plaintiff cites a series of cases where courts have found no valid rescission because the buyer failed to make an unequivocal offer to return the goods, as where an automobile purchaser demanded return of his money, a new motor, or else a new automobile, Barry v. Cronin, 1930, 272 Mass. 477, 172 N.E. 595, 597, or where a printing-press purchaser offered return of the press conditioned upon payment of damages incurred in using it. Claybourn Corp. v. Cuneo Press, D.C.N.D. Ill.1939, 27 F.Supp. 231.

■ However, if the C.C.C.'s notices were at first technically imperfect for making demands inconsistent with rescission, it did not thereby waive its rights to rescission. Simrall v. American Multigraph Sales Co., 1913, 172 Mo. App. 384, 158 S.W. 437, 440 (dictum). The plaintiff's immediate denial of total liability, especially when the defendant had already paid for the goods, relieved the C.C.C. from further perfecting its offer or tender of return. See Gunderson v. Brey, 3 Cir., 1914, 210 F. 401, 408; 77 C.J.S. Sales § 107, p. 813 (1952). The law in such a case does not require vain things. See Garbark v. Newman, 1952, 155 Neb. 188, 51 N.W.2d 315, 323. Under the circumstances, C.C.C. properly stood on its right to rescind by reselling the milk for the account of the plaintiff.

■ But should there be error in finding a valid rescission on these facts, it appears to me to be immaterial, because in any event, it is apparent that the award of the Board could be upheld as a recovery of minimum damages for breach of warranty.

■ The plaintiff urges, however, that proof of actual damages for breach of warranty in this case would be impossible because the government, under its price support program, ordinarily gives away two-thirds of its dried milk and thus actually would have lost money on this milk if it had been perfect, so that there could be no damages to the government when the milk is imperfect. The plaintiff also states that at the time of resale, the government was actually selling wholesome dried milk for animal feed for the same price as it sold the infested milk. But the proper measure of damages in this case would be based on the market price at which the government was purchasing dried milk, and not that at which the government was disposing of it. Cf. Fort Worth & Denver Ry. v. United States, 5 Cir., 1957, 242 F.2d 702, 705; United States v. New York, N. H. & H. R. R., 2 Cir., 1954, 211 F.2d 404.

The plaintiff also urges that the Board erred as a matter of law in finding that an implied warranty existed as to the Dresser milk. This same contention is not raised as to the Lake Crystal milk, because the Lake Crystal contracts contained express warranties placing liability on the plaintiff for infestation at time of delivery if discovered within a year subsequent to delivery.

■ The basis of the plaintiff's contention is that no implied warranty of fitness could arise in the Dresser purchases because the continual government supervision and inspections of the plant and of the product show that there was no reliance by the government on the skill and judgment of the plaintiff in producing the dried milk. The plaintiff claims such reliance is essential to create an implied warranty here and cites Maryland Casualty Co. v. Independent Metal Products Co., 8 Cir., 1953, 203 F.2d 838, in support.

But such a requirement is essential only to the implied warranty of fitness

for a particular purpose, and is not an essential condition to the implied warranty of merchantability:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is and implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer of not), there is an implied warranty that the goods shall be of merchantable quality." 30 Minn. Stat.Ann. §§ 512.15(1, 2) Uniform Sales Act § 15(1, 2).

The main limitation to the warranty of merchantability is that:

"(3) If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed." 30 Minn.Stat.Ann. § 512.15(3); Uniform Sales Act § 15(3).

In the case of Smith v. Great Atlantic & Pacific Tea Co., 8 Cir., 1948, 170 F.2d 474, the Court held that the implied warranty of merchantability had been breached in the sale of canned spinach infested with plant lice, and that a previous government inspection, even if made on behalf of the purchaser, did not preclude the warranty from arising because there was no showing that the inspection ought to have revealed the defect, under § 15(3) cited above.

■ I think the theory of that case is controlling here. The implied warranty of merchantability should at least insure that powdered milk purchased from a manufacturer will not be infested with insects. The Board heard much testimony concerning the nature of the government inspections of the plant and product and concluded that:

"The initial inspection of the milk powder by the U. S. Department of Agriculture at the time the milk powder was delivered to C.C.C. was not made for the purpose of detecting the presence of insect infestation in the milk powder, the liners or the containers; and the methods employed in conducting such initial inspection were incapable of detecting the presence of insect infestation."

■ I find no error of law in the Board's conclusion that an implied warranty arose as to the Dresser milk.

Some additional complaints have been made by the plaintiff that it was not permitted access to the full report made by the scientists who conducted the Madison experiments and that the plaintiff was thus limited to cross-examining the government's expert only on the basis of a summary report. The plaintiff submits that the full report would show that the life cycle and reproduction ability of the beetles, on a diet of dried milk, was so limited that had the beetles been present at delivery, they could not have been found alive six months later. But this matter was presented to the Board, both in the form of the plaintiff's testimony as to conversations with subordinate government scientists who had worked on the experiments, and in the form of the testimony of the head entomologist who denied the shortness of the life cycle and the inability to reproduce. It may be that some constitutional or administrative law issue may lurk in the procedures followed by the Board, but the plaintiff has not presented them as such. Possible impropriety in the procedure does not affect our conclusion that the Board's findings were supported by substantial evidence and were not based on an error of law.

The decision of the Board is upheld. Defendant will please prepare findings in accord with this memorandum.

Appendix

## 11 Carlots from Lake Crystal, Minnesota Plant

| | | Shipments | | | Product Inspection Reports | | | | | | | Warehouse Inspections | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contract Number | No. of Carlots | Date of Manufacture | Date of 1st Inspection | Destination | Certificate Number | Date | Carlot | Sampled | Infested | Extent of Infestation Reported | Type Reported | Date | Report |
| 7203 | 1 | 4/16 to 4/19 | 4/20/55 | Cedar Rapids-Chicago | 50420 | 10/11/55 | 200 | 29 | 1 | Live larvae between liners | T.I.; T.O., A.P. | | |
| 7623 | 1 | 5/1 to 5/4 | 5/5/55 | Cedar Rapids-Chicago | 50419 | 10/7/55 | 200 | 31 | 1 | Live larvae & skin between liners | | | |
| 9378 | 1 | 6/8 to 6/11 | 6/13/55 | Cedar Rapids-Chicago | 50416 | 10/5-6/55 | 200 | 18 | 9 | Cast skins & live larvae between liners 2 barrels contained skins in powder | | | |
| 9508 | 1 | 6/14 to 6/17 | 6/17/55 | Cedar Rapids-Chicago | 50417 | 1/6-7/55 | 200 | 31 | 3 | Live larvae & cast skin between liners | | | |
| 9508 | 1 | 6/11 to 6/14 | 6/15/55 | Cedar Rapids | 02105 | 10/10/55 | 183 | 12 | 5 | Live insects & cast skins between all liners. 1 live insect in milk in 1 barrel | T.I., T.O. | | No Inspection made of Chicago Railroad cars |
| 9826 | 1 | 6/22 to 6/25 | 6/27/55 | Cedar Rapids-Chicago | 50418 | 10/6/55 | 200 | 41 | 1 | Live adult beetle in powder; No tears in liner | | | |
| 9947 | 1 | 6/25 to 6/27 | 6/28/55 | Cedar Rapids-Chicago | 50422 | 10/6/55 | 200 | 3 | 1 | Live larvae between liners | T.I.; T.O., A.P. | | |
| 10071 | 1 | 6/30 to 7/3 | 7/4/55 | Cedar Rapids-Chicago | 50421 | 10/7/55 | 200 | 1 | 1 | Live larvae between liners | | | |
| 10071 | 1 | 7/3 to 7/6 | 7/7/55 | Cedar Rapids | 02106 | 10/10/55 | 200 | 13 | 1 | Live insects between liners | T.I., T.O. | 10/11/55 | Cedar Rapids Whse. Not Infested |
| 10260 | 1 | 7/9 to 7/12 | 7/13/55 | Cedar Rapids | 02107 | 10/10/55 | 200 | 13 | 2 | Live insects between liners | | | |
| 10260 | 1 | 7/6 to 7/9 | 7/11/55 | Cedar Rapids | 02108 | 10/10/55 | 200 | 13 | 2 | Live insects between liners | | | |
| | | | | | | Total | 2183 | 241 | 27 | | | | |

Comments:
These 11 carlots were part of 28 carlot shipments made between April and July, 1955. Infestation was found in 2 other carlots, but not attributed to the Lake Crystal plant. No infestation was reported in the other 15 carlots.

Plant Inspections:
The Lake Crystal plant was inspected and approved on August 17, 1954, May 5, 1955 and on August 31, 1955. On October 7, 1955, cast skins were found in ceiling of warehouse where liners are stored. Specimens were identified as Trogoderma inclusum.

Code:
T.I.—Trogoderma Inclusum
T.O.—Trogoderma Ornatum
T.P.—Attagenus Piceus

## 7 Carlots from Dresser, Wisconsin Plant

| Shipments | | | | | Product Inspection Reports at Warehouse | | | | | | | Warehouse Inspections | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contract Number | No. of Carlots | Date of Manufacture | Date of 1st Inspection | Destination | Certificate Number | Date | Carlot | Sampled | Infested | Extent of Infestation Reported | Type Reported | Date | Report |
| 94918 | 1* | 5/6 to 5/10 | 5/14/53 | Interstate Whse., K.C. | DM–39483 DM–58621 | 10/7/53 | 224 | 15 | (not reported) | "Beetle Infested." | T.I., and thylodrias contractus | | Interstate Whse. Infested—A.P. |
| 95440 | 1 | 5/19 to 5/20 | 5/26/53 | Bardwell Whse., Mpls. | DM–5073 | 1/15/54 | 209 | 16 | 1 | Insects between liners | T.I., A.P. | 1/18/54 | Bardwell Whse. Infested—A.P. |
| 95478 | 1 | 5/23 to 5/27 | 5/29/53 | to | DM–50562 | 1/12/54 | 224 | 16 | 1 | Insects between liners | | 1/18/54 | Williams Whse. No Infestation |
| 95542 | 1 | 5/28 to 5/31 | 6/ 2/53 | Williams Whse., Mpls. | DM–50563 | 1/12/54 | 190 | 14 | 2 | Insects between liners | | | |
| 95965 | 1* | 6/9 to 6/13 | 6/16/53 | Rock Island Whse., Mpls. | DM–50632 | 2/12/54 | 214 | 16 | 5 | Insects between liners & 1 in milk; liner broken | T.I., tenebrionidae | 12/17/53 | Rock Island Whse. Infested—A.P. |
| 95965 | 1* | 6/13 to 6/17 | 6/19/53 | | DM–50633 | 2/12/54 | 187 | 13 | 2 | Insects between liners | | | |
| 96266 | 1* | 6/23 to 6/26 | 6/27/53 | | DM–50612 | 1/29/54 | 197 | 14 | 1 | Insects between liners | | | |
| | | | | | | Total | 1445 | 104 | 14(minimum) | | | | |

Code:
T.I.—Trogoderma Inclusion
A.P.—Attagenus Piceus

**Comments:**
These 7 carlots were part of 29 carlot shipments made over period of May to July to 14 different warehouses. No infestation reported in other carlots.

**Plant Inspections:**
The Dresser Plant was inspected and approved on February 8, 1953 and on June 14, 1953. On November 2, 1953 cast skins were found in ceiling of storage area for Kraft Liners. No determination of species was made because specimens were lost in the mails.

*No timely notice of rescission was given by C.C.C., and it was denied recovery.