**GREENWOOD PRODUCTS CO. et al. v.
UNITED STATES.**

No. 13254.

United States Court of Appeals
Fifth Circuit.

April 18, 1951.

Rehearing Denied May 16, 1951.

Dan MacDougald, Welborn B. Cody, Atlanta, Ga., J. E. D. Yonge, Pensacola, Fla., for appellants.

Neil Brooks, Associate Sol., Lewis A. Sigler, Asst. Associate Sol., U. S. Dept. of Agriculture, Washington, D. C., George Earl Hoffman, U. S. Atty., Pensacola, Fla., for appellee.

Before H O L M E S, B O R A H and STRUM, Circuit Judges.

STRUM, Circuit Judge.

This is an action by the United States against Greenwood Products Company, and others, to recover balances alleged to be due on the value of a large quantity of peanuts destroyed by fire. There was judgment for plaintiff below, from which the defendants appeal. The controlling questions are (a) whether the risk of loss was upon the United States or upon the appellant Greenwood Products Company, and if the latter then (b) the measure of recovery to which the United States is entitled.

As a part of the commodity conservation program authorized by the Second War Powers Act of 1942, 50 U.S.C.A. Appendix, § 633, Commodity Credit Corporation, a wholly owned agency of the United States, was designated by the War Foods Administrator as the sole purchaser of the entire 1943 peanut crop. Commodity was authorized to resell to shellers and crushers of peanuts, called processors, and thus control the product. Each processor was limited as to the quantity of peanuts he could secure for use.

Commodity Credit Corporation entered into a uniform "sheller" contract with Greenwood Products Company, under the terms of which Greenwood, as agent of Commodity Credit Corporation, agreed to purchase for the account of said Corporation, all farmer stock peanuts offered for sale by growers in the designated area in which its plant was located, paying to the grower not less than the minimum support price fixed by law, for which purpose Greenwood advanced its own funds. Greenwood was obligated by the contract, to the extent of its allocation and facilities, to re-purchase from Commodity Credit Corporation, for its own account, the peanuts purchased from growers, at specified contract prices, which were higher than the prices paid to the growers. These are known as "allocated" peanuts. Those purchased from growers in excess of such allocation were required to be stored by Greenwood for the account of Commodity Credit Corporation, and are called "stockpile" peanuts. Within the limits of their allocations, processors could also purchase stockpile peanuts as desired.

Within five days after the close of each week, Greenwood was required to report to Commodity the quantity of peanuts purchased by Greenwood from growers for the account of Commodity, the quantity repurchased by Greenwood for its own account under its allocation, and the quantity stockpiled for Commodity. With this report Greenwood was required to remit, as to allocated peanuts, the difference between the support price already paid by it to the growers and the specified contract price payable by the processor to Commodity, which was higher. As to stockpile peanuts, Commodity reimbursed Greenwood for the purchase price paid to the growers, plus certain incidental expenses. Title to all peanuts remained in Commodity until they were paid for in full by the processor.

The peanuts in appellant's warehouse at the time of the fire, November 6, 1943, had been accumulated from various sources during the preceding two months. Reports and remittances thereon were in various stages of progress when the fire occurred. As to some, Greenwood had submitted complete allocation reports and had paid the growers therefor, but had not paid to Commodity the difference between the grower's price and the contract price to processors. There were other allocated peanuts, recently received from growers, as to which no allocation reports had been made by Greenwood to Commodity, nor had the purchase price been paid to growers or to Commodity. After the fire, however, allocation purchase reports were duly executed for these, and the growers paid, but Greenwood denied liability to Commodity for any sum above the price paid to the growers.

There were also in the warehouse a large quantity of stockpile peanuts, owned by Commodity, for which stockpile purchase reports had been issued prior to the fire and the growers paid therefor. There were other stockpile peanuts, recently received from growers, for which the growers had not been paid nor had purchase reports as yet been executed. Such reports, however, were duly executed after the fire, and the growers paid, as in the case of the allocated peanuts last above mentioned. All the above mentioned peanuts, both allocated and stockpile, were destroyed by fire.

Appellants contend that the allocated peanuts as to which reports had not been submitted, or were incomplete at the time of the fire, and for which Commodity had not been paid, were in the possession of Greenwood, not for itself, but as bailee for Commodity under an executory contract of sale under which Commodity was still the owner of the peanuts, and that the risk of loss as to these peanuts was upon Commodity as title had not passed to Greenwood. If, however, the loss falls upon Greenwood, it asserts as to both allocated and stockpile peanuts that Commodity should recover only the cost of procuring the same from the growers, and not the higher contract price of re-sale by Commodity to processors, for which Commodity contends and which the trial court awarded,[1] aggregating $133,506.71 above the cost paid to growers. In other words, Greenwood contends that if Commodity is entitled to anything, it is entitled only to its buying price, not to its selling price.

Paragraph 8(b) of the contract, as originally executed, contained a provision, amongst others, that the risk of loss of allocated peanuts should pass to Greenwood immediately upon purchase thereof from the growers, or if the peanuts were allocated from stockpile peanuts, then immediately upon removal from the stockpile. Before the fire, this paragraph was amended with respect to the time within which Greenwood was required to purchase and pay for allocated peanuts. The above referred to provision as to the risk of loss

was omitted from the amended paragraph, so that the contract was then silent as to risk of loss of allocated peanuts, thus leaving that question to be determined by the general law of sales in Florida.

In Florida, it is the general rule in the sale of personal property that risk of loss is upon the vendor until title passes, and that as between the parties to the contract title does not pass so long as anything remains to be done, either by vendor or vendee, to make the sale complete. Tripp v. Wade, 82 Fla. 325, 89 So. 870.

An exception to that rule is recognized where, as here, a vendee is given complete possession of personal property, with the right to use it as his own, and with an unconditional promise to pay for it, the vendor retaining legal title to the property as security until the purchase price is paid. As the vendee has absolute dominion over the property, with the right to use it as his own, the risks of loss incident to complete ownership are also cast upon him, unless otherwise specifically provided by the contract. Phoenix Ins. Co. v. Hilliard, 59 Fla. 590, 52 So. 799; 38 A.L. R. note 1319.

As to the allocated peanuts, this case falls within the exception. It was not only Greenwood's right, it was its obligation, to the extent of its allocation, to buy and pay for the allocated peanuts at sheller's prices, and Commodity was unconditionally entitled to the purchase price. Greenwood was in complete possession of the peanuts, and had the right to use them as its own for shelling purposes. Legal title remained in the vendor only as security. The contract required allocated peanuts to be physically segregated from stockpile peanuts, which presumably was done. Although allocation reports had not yet been submitted for some of the peanuts, their allocation was confirmed by submission of such reports after the fire. In these circumstances, the sale of the allocated peanuts was so far complete as to constitute Greenwood the beneficial owner thereof and to cast upon it the risk of loss. Accordingly, Greenwood is liable to Commodity

---

1. U. S. v. Greenwood Products, D.C., 87 F.Supp. 785.

for the allocated peanuts at the contract sale price to shellers, which price it had agreed to pay for them. Phoenix Ins. Co. v. Hilliard, supra, 47 Am.Jur. "Sales," sec. 877. Cf. Pelham Oil & Fertilizer Co. v. United States, 5 Cir., 173 F.2d 888. The facts here differ in principle from those in Tripp v. Wade, supra, and Planters' Oil Mill & Gin Co. v. A. K. Burrow Co., 5 Cir., 10 F.2d 312, relied upon by defendant.

Title to stockpile peanuts was concededly in Commodity. As to these the contract was essentially a warehousing contract. Amended paragraph 6(e) of the contract required Greenwood to insure stockpile peanuts "for an amount equal to the aggregate purchase price thereof determined in accordance with Exhibit B" attached to the contract.[2] That exhibit is a schedule of contract prices at which peanuts were sold by Commodity to shellers, so that in effect the contract required insurance at their value based upon re-sale contract prices to shellers. They were so insured at the time of the fire. The insurance companies acknowledge their liability to Greenwood at that value. This is a permissible valuation. The differential between the buying and selling price was not a "profit" to Commodity. It was designed to absorb losses suffered by Commodity on its "crusher" contracts, under which it sold peanuts to crushers at less than the price it paid the growers therefor. The apparent gain on the sheller contracts approximately offset the loss on the crusher contracts.

██ Commodity has an insurable interest in the difference between the buying price from growers and its re-sale price to shellers, as it was selling the peanuts in the market at the latter price. Upon their loss by fire, Greenwood would be liable for the value at which it agreed to, and did, keep them insured for the benefit of Commodity, that is, the contract sale price to shellers, which is also the market price, as Commodity's contract price controls the market. Dixey v. Federal Compress & Warehouse

Co., 8 Cir., 132 F.2d 275; Century Ins. Co. v. First Nat'l Bank, 5 Cir., 102 F.2d 726, certiorari denied 308 U.S. 570, 60 S.Ct. 84, 84 Ed. 478; Danko v. Lewy, 5 Cir., 149 F.2d 66.

So far as the measure of recovery is concerned, it is immaterial whether any given lot of these peanuts were allocated or stockpile, since in either event the United States is entitled to recover on the basis of their re-sale value for shelling purposes.

It is unnecessary to separately examine the liability of Greenwood's co-defendants below, the surety on its performance bond and the insurers of the peanuts, as each concedes that to the extent of their respective undertakings their liability follows that of Greenwood, though they urge the same defenses already considered as to Greenwood.

The trial court was correct in awarding plaintiff below the difference between the buying price from growers (which Greenwood has already paid) and the selling price to shellers for both allocated and stockpile peanuts, aggregating $133,506.71, with interest from the due date.

Affirmed.

---

2. For its own protection, Greenwood also insured *allocated* peanuts at their actual cash value, though it was not required by the contract to do so.