**JOHN MORRELL AND COMPANY,**
**Plaintiff-Appellee,**

v.

**BURLINGTON NORTHERN, INC.,**
**Defendant-Appellant.**

**No. 76–2055.**

United States Court of Appeals,
Seventh Circuit.

Heard April 18, 1977.

Decided Aug. 4, 1977.

Barry N. Gutterman, Chicago, Ill., for defendant-appellant.

Marvin H. Ruttenberg, Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, SWYGERT and CUMMINGS, Circuit Judges.

PER CURIAM.

The question involved on this appeal is whether under the Carmack Amendment to the Interstate Commerce Act which provides that a shipper shall recover "the full actual loss, damage, or injury to [its] property caused by" a railroad (49 U.S.C. § 20(11)), it was permissible to apply the

contract price method of ascertaining damages instead of the market value method.[1] Liability having been conceded, the district court held that on the particular facts the contract price method rather than the market value rule championed by defendant interstate carrier should be used to measure damages suffered by plaintiff shipper-owner.

The stipulation of facts shows that plaintiff was a St. Paul, Minnesota, meat packer. Shortly prior to February 9, 1974, plaintiff sold 1,000 boxes of chucks to Purity Supreme, a retail chain store grocery operation in North Billerica, Massachusetts, for $84,817.40.[2] The chucks were to be delivered to Purity Supreme no later than February 15, 1974, and title, in accordance with the normal custom in the meat trade, was to pass to Purity Supreme upon delivery of the chucks in good condition.

Plaintiff delivered the chucks in proper condition to defendant railroad as the originating carrier on February 9, 1974, for delivery to Purity Supreme as consignee under a Uniform Straight Bill of Lading calling for delivery of the shipment to the consignee "AS SOON AS POSSIBLE NO LATER THAN 2/15/74." This date was well within the usual and customary length of time for rail shipments between St. Paul and North Billerica. The shipment was unreasonably delayed in transit by defendant and other connecting carriers and did not arrive at consignee's siding until 5:20 p. m., on Friday, February 22, 1974. The consignee then orally protested to the delivering carrier about the failure of the shipment to arrive by February 15 and about any consequent deterioration in its condition.

On February 25,[3] the consignee advised plaintiff that it would reject the shipment unless given a discount of 20¢ per pound from the purchase price to reflect the drop in market value between February 9 and February 25, as disclosed in the National Provisioner Quotations. The consignee also requested full credit for any unsound meat.

Before acceding to the consignee's demands, plaintiff attempted to sell the shipment to other purchasers in the surrounding market at better prices, but none even would bid on it. Therefore, plaintiff accepted the consignee's conditions. Thereafter, the consignee paid plaintiff $60,353.15 for the shipment, instead of $84,817.40, causing plaintiff a $24,255.96 loss (after deducting $208.28 salvage proceeds that the consignee received for 8,871 pounds of unsound chucks).

Defendant carrier admitted that it was liable to plaintiff in the amount of $9,017.56 for all the condemned chucks ($9,255.20 invoice price less the $208.28 salvage proceeds). As to the balance of the shipment, defendant asserted that it was liable only for the amount of the drop in market value of the unspoiled bulk of the product between February 15, the date on which it was due in North Billerica, and February 25, the date on which it actually arrived there and was available for unloading by the consignee, or $4,190.23. Therefore, defendant offered to pay plaintiff a total of $13,207.79, but plaintiff insisted upon receiving $24,255.96, the full amount of its loss, and accordingly filed this suit.

In an unreported memorandum opinion, the district court measured the damages by the contract rule and awarded plaintiff

1. There is no dispute that the measure of damages is controlled by the Interstate Commerce Act's Carmack Amendment. *Missouri Pac. R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137, 84 S.Ct. 1142, 12 L.Ed.2d 194. Subject matter jurisdiction was properly lodged in the district court under 28 U.S.C. § 1337.

2. The original purchase price was $90,789.55 for 90,808 pounds, but the shipment weighed only 85,057 pounds, thus causing an agreed correction in the purchase price.

3. When finally delivered at 5:20 p. m. on Friday, February 22, it was too late to unload the shipment. It was also too late in the day to contact plaintiff shipper-owner to see if Morrell, in order to prevent the consignee's rejection of the shipment, would grant a price discount to reflect the drop in market value that had occurred during the delay, as well as full credit for any unsound meat. Since the consignee's and plaintiff's places of business were closed on Saturday and Sunday, the consignee's decision to accept or reject was postponed until Monday, February 25, 1974.

$24,255.96, the difference between the contract sale price the consignee agreed to pay before transportation of the goods and the best available price that plaintiff was able to obtain at destination. The court refused to apply the market value rule which measures damages by the difference between the market value of the goods at the time they should have arrived and the market value at the time they did arrive. Judge Kirkland noted that in *Illinois Central RR Co. v. Crail,* 281 U.S. 57, 64–65, 50 S.Ct. 180, 74 L.Ed. 699, Mr. Justice Stone stated that the market value rule may be discarded where other more accurate means of ascertaining damages exist. In that case, the Court held that a recovery measured by the wholesale market value of the coal rather than the retail value would fully compensate the consignee for the carrier's failure to deliver part of a shipment of coal because the consignee had not earned a retail profit by any contract of resale (*id.* 63, 50 S.Ct. 180). In contrast here, the district court noted (App. 14a):

"In the instant case, before the goods were shipped, plaintiff and consignee entered into a contract that stipulated the contract price and included plaintiff's profit. If the market value rule were applied, plaintiff would lose much of the profit he would have earned had there been no shipment delay. Such a result would be in conflict with the Interstate Commerce Act, 49 U.S.C. § 20(11) which states that the common carrier shall be liable 'for the *full actual loss, damage, or injury* . . .'" (Emphasis in original.)

In closing, the opinion below rejected defendant's argument that it was entitled to "special warning" before it could be held liable under the contract rule of damages, for the court held that as a common carrier, "defendant knew or should have known that timely delivery of a shipment of meat is essential to its value" (*idem*). We affirm the judgment for plaintiff.

In *Great Atlantic & Pacific Tea Co. v. Atchison, Topeka & Santa Fe Ry. Co.,* 333 F.2d 705, 708 (7th Cir. 1964), certiorari denied, 379 U.S. 967, 85 S.Ct. 661, 13 L.Ed.2d 560, then Chief Judge Hastings pointed out that the market value rule "is not applied where it is demonstrated that another rule will better compute actual damages."[4] Under the Carmack Amendment, plaintiff is entitled to recover its "full actual loss." The only way to reimburse this shipper-owner for its "full actual loss" is to use the contract price method, as in *F. J. McCarty Co. v. Southern Pacific Company,* 428 F.2d 690, 692 (9th Cir. 1970); *Atlantic Coast Line Ry. Co. v. Roe,* 96 Fla. 429, 118 So. 155 (1928); and *National Beef Packing Co. v. Missouri Pac. R. Co.,* 479 S.W.2d 155 (Mo. App.1972).

Defendant maintains that the unspoiled bulk of the shipment was in marketable condition. But as detailed above, no buyers existed in the market other than the consignee. Since plaintiff was unable to locate any other buyer in its attempt to mitigate damages, it rightly sold the chucks to the consignee on the best terms available, thus lessening its damages. If this had not been done, the market value of the chucks would have been nothing other than what scavenger services might have paid. And if this had been done, damages as measured by a market value standard would have been much larger than those actually claimed here. In these circumstances the theory which underlies the market value rule breaks down. *Great Atlantic & Pacific Tea Co., supra,* at 708; *McCarty, supra,* at 692.

Plaintiff was unable to force Purity Supreme to accept the shipment with an allowance of 5½¢ per lb. (the drop in market value between the February 15 billing date and February 25 when the chucks were first available for unloading),[5] as urged by defendant, because the delay

---

**4.** See also *United States v. Palmer & Parker Co.,* 61 F.2d 455, 459 (1st Cir. 1932).

**5.** *Chicago, R I & P Ry. Co. v. Albert Pfeifer & Bro.,* 90 Ark. 524, 119 S.W. 642 (1909), does not support defendant, for it involved an owner-consignee, not a shipper-owner such as plaintiff.

worked a material breach of the contract between the shipper and consignee. We are cited to no authority compelling plaintiff to sue the consignee instead of the carrier, as defendant suggested at oral argument.

■ The award based on the contract price rule does not constitute special damages requiring pre-shipment notice to the carrier. *F. J. McCarty Co., supra,* at 692–693; *National Beef Packing Co., supra* at 158. In any event, the bill of lading made it clear that time was of the essence and set an absolute deadline, *viz.,* "DELIVER AS SOON AS POSSIBLE NO LATER THAN 2/15/74."

JUDGMENT AFFIRMED.