**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**CROWN EQUIPMENT CORPORATION,**
**Defendant–Appellant.**

No. 95–2035.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 23, 1995.

Decided June 13, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied Aug. 21, 1996.

Mark A. Cameli (argued), Office of U.S. Atty., Madison, WI, for plaintiff-appellee.

Donald M. Lieb (argued), Paul J. Pytlik, Otje, Van Ert, Stangle, Lieb & Weir, Milwaukee, WI, for defendant-appellant.

Before CUMMINGS, RIPPLE and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

The United States, as the real party in interest, commenced this action on behalf of the Commodity Credit Corporation to recover damages for commodities destroyed in a warehouse fire in Wisconsin. See 15 U.S.C. § 714b(c). The destroyed commodities, including millions of pounds of surplus butter, had been acquired by the United States under a federal price-support program. Crown stipulated to its liability for the fire, and the district court entered a damage award based on the Chicago Mercantile Exchange price of butter on the day of the fire. Crown appeals the district court's determination of damages. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

I

BACKGROUND

A. *Facts*

On May 3, 1991, a fire destroyed most of the Central Storage Warehouse ("CSW"), a privately-owned storage facility in Madison, Wisconsin. At the time, the United States had various surplus commodities, including approximately fifteen million pounds of sur-

plus butter, in cold storage at the warehouse. The fire resulted in the loss of the following government-owned commodities:

Print Butter
Grade AA . . . . . . . . . . . . . . . . . . . 9,204,080 lbs.
Grade A . . . . . . . . . . . . . . . . . . 1,603,819 lbs.

Total Print Butter . . . . . . . . . . . . 10,807,899 lbs.
Bulk Butter
Grade AA . . . . . . . . . . . . . . . . . . . . 44,024 lbs.
Grade A . . . . . . . . . . . . . . . . . . . . . 81,935 lbs.

Total Bulk Butter . . . . . . . . . . . . . . . 125,959 lbs.
Frozen Mixed Vegetables . . . . . . . . . . 1300 cases.

The United States contributed $240,901.75 for clean-up and salvage efforts related to the fire. Through these efforts, the government was able to convert some of the melted butter into livestock feed and sell it for $42,-952.60.

The United States commenced this action against Crown to recover damages for the commodities lost in the fire. The complaint alleged that a forklift, designed and manufactured by Crown, ignited the fire at CSW. Crown stipulated to its liability for the fire and to the fact that ignition of the fire was a proximate cause of the damage to the commodities. Only the issue of damages remained. On this question, the parties disagreed about the appropriate measure of damages for butter purchased by the government through a price-support program.

### B.  *Butter Price–Support Program*

In order to understand the arguments raised by the parties and the district court's resolution of the issue, it first is necessary to examine the structure of the butter price-support program and the nature of the butter that was destroyed in the fire.

#### 1.

All of the butter destroyed in the CSW fire had been purchased by the Commodity Credit Corporation ("CCC"), a corporation owned by the United States. Originally incorporated under a Delaware charter in 1933, the CCC was reincorporated in 1948 as a federal corporation within the Department of Agriculture. *See* Commodity Credit Corporation Charter Act, 15 U.S.C. § 714 *et seq.* The

principal function of the CCC is to administer government price-support programs for agricultural commodities. Price support is achieved through purchases of selected commodities at announced levels.[1]

The dairy price-support program is authorized by the Agricultural Act of 1949. See Pub.L. No. 81–439, 63 Stat. 1051 (codified as amended principally at 7 U.S.C. § 1421 *et seq.*). In order to stabilize the supply and demand for dairy products, the price of milk is supported through purchases by the CCC. Milk is also supported through purchases of butter, cheese, and nonfat dry milk. The purchased milk and milk products are added to the CCC's price-support inventory. Specifically, the price-support program for butter works in the following manner.

The support price for fluid milk is set by Congress. *See* 7 U.S.C. § 1446e(b). Congress has authorized the USDA to calculate, from this figure, an equivalent support price for dairy products such as butter, cheese, and nonfat dry milk. *See* 7 U.S.C. § 1446e(c)(3)(A). With respect to butter, this calculation yields the support price for bulk butter; the support price for print butter is determined by adding a fixed per-pound differential to the support price for bulk butter. These figures are known as the "announced support prices." The CCC then stands willing to buy any amount of print or bulk butter at the announced support prices. There is no limitation on the quantity of butter that the CCC is willing to purchase at the support price; it will buy as much as producers and handlers are willing to sell.

Bulk butter and print butter are the same commodity; the only difference lies in the packaging. Bulk butter is packaged in twenty-five kilogram blocks and generally must be processed into some other form prior to commercial use. Print butter is packaged in one-pound "prints" and is ready for use by the customer. Stored at zero degrees Fahrenheit, bulk butter has a shelf life of four years; print butter has a shelf life of two

---

1. Eligible commodities include wheat, feed grains (barley, corn, sorghum, oats, and rye), rice, cotton (upland, extra long staple, and seed), tobacco, honey, peanuts, minor oilseeds (mustard, seed canola, rapeseed, flaxseed, sunflower seed and safflower seed), soybeans, sugar (beet and cane), and milk.

years. As discussed above, the CCC stands willing to purchase both bulk and print butter through the price-support program.

The CCC's inventory, therefore, is comprised of both bulk and print butter. Some of the print butter is "printed" by the producer before it is sold to the CCC. The CCC, therefore, does not know in advance how much print butter it will receive from producers. Because some of the consumption outlets for surplus butter require the CCC to distribute butter in print form, the CCC periodically will "print" some of its stock of bulk butter. Regardless of who prints butter for the price-support program—the producer or the CCC—it is packaged with the words "Not for sale or exchange."

Except in limited circumstances, butter purchased through the price-support program is stored in private warehouse facilities throughout the country. Consistent with USDA policy of using the oldest butter first and taking into account location and program needs, the butter generally is distributed to consumption outlets within six to twelve months of its purchase. In order of priority, the consumption outlets are: (1) domestic sales; (2) domestic donations; (3) export sales; and (4) export donations.

The highest priority use is domestic sales. USDA policy, however, limits the circumstances in which the CCC can sell butter in the domestic market. In order to avoid deterring commercial sales or causing purchasers to rely upon the government as a supplier of butter, the CCC may sell butter only at a price equal to 110 percent of the support price in effect at the time the butter is resold. The purpose of this limitation is to prevent the sale of surplus butter from negating the effect of the price support in the domestic commercial market.

The second priority for surplus butter is domestic donations. These include donations to needy families, school lunch programs, institutions, the United States military, Veterans Hospitals, and the Bureau of Prisons. Because the needs of these recipients are based on individual consumption, these donations usually take the form of print butter.

Export sales is the third priority for price-support butter. Due to refrigeration problems abroad, these sales usually take the form of butter oil, which is acquired by melting down bulk butter. The same is true for the fourth priority for surplus butter, export donations. Export donations are made under section 416 of the Agricultural Act of 1949, see 7 U.S.C. § 1431, and include CCC donations to foreign countries directly or through cooperating sponsors and relief agencies.

2.

The butter destroyed in the CSW fire had been purchased by the CCC during the second half of the 1990 calendar year. During that time period, the support price set by Congress for fluid milk was $10.10 per hundredweight. 7 U.S.C. § 1446e(b), (d)(4). The USDA translated this figure into an announced support price of $0.9825 per pound for bulk butter and $1.01 per pound for print butter. All of the butter damaged in the fire had been purchased at these prices. The butter destroyed in the fire was "uncommitted," meaning that it had not yet been designated for a specific use or program.

The CSW fire occurred at a time of record surplus for government butter. Six weeks after the fire, the CCC had in storage an inventory of 494.5 million pounds of bulk butter, 61.6 million pounds of print butter, and 6.4 million pounds of butter oil. At the end of fiscal year 1991, approximately five months after the fire, the CCC owned 494.2 million pounds of uncommitted butter, the highest end-of-the-year figure on record.[2]

The CCC did not purchase additional butter specifically to replace the butter destroyed in the CSW fire. Because the butter destroyed in the fire consisted primarily of print butter, however, the CCC was forced to replenish its stocks of print butter in order to continue to meet program needs. The government paid the cost of converting approxi-

**2.** At the end of fiscal year 1992, the CCC owned 378.3 million pounds and, at the end of fiscal 1993, 261.8 million pounds.

mately eleven million pounds of bulk butter, stored at different facilities, into approximately eleven million pounds of print butter—roughly the amount of print butter lost in the fire. The government had sufficient butter in storage to meet all of its domestic and foreign needs; no program went without butter because of the fire. Nor did the fire cause the government to lose any foreign or domestic sales.

## C. *Proceedings in the District Court*

The primary issue for the district court was to determine the appropriate measure of damages for the butter lost in the fire. The parties sought to resolve this question through cross-motions for partial summary judgment.

In its motion, Crown urged the court to rule as a matter of law that the United States' damages would be limited solely to the costs and expenses it incurred as a result of the fire. Crown contended that the government had expended $993,245.91 in the course of transporting surplus bulk butter from other sites and converting it into print butter. In its cross-motion, the United States asked the court to rule as a matter of law that its damages should be measured by the price of butter on the Chicago Mercantile Exchange as of the day of the fire. Through the affidavit of Steven W. Schneeberger, a dairy market news reporter for the USDA, the United States sought to establish that print butter was selling on the Exchange for $0.99 per pound and that bulk butter was selling for $.9625 per pound on the day of the fire. In addition to the market value of the butter, the United States sought to recover an additional ten to eleven cents per pound for the cost of converting the bulk butter to print butter.

The district court denied Crown's motion for partial summary judgment and granted the United States' motion in part. Relying on *United States v. New York, N.H. & H.R. Company,* 211 F.2d 404 (2d Cir.1954) and *Fort Worth & Denver Railway Company v. United States,* 242 F.2d 702 (5th Cir.1957), the court ruled, as a matter of law, that the measure of damages for all the butter destroyed was the fair market value of the butter as determined by the Chicago Mercantile Exchange price on the day of the fire. Using this measure, the court found that the bulk butter destroyed in the fire had a value of $121,675.78. The United States would have to deduct $42,952.00 from this figure for the salvage value of the butter. Noting that the United States sought an additional per-pound allowance for the cost of converting the bulk butter to print butter, however, the court ruled that a factual issue remained on the damages for the print butter. Some question also remained as to the United States' obligation to assist with clean-up expenses.

Both parties filed motions to reconsider. Having decided to delete its claim for the cost of converting and transporting the bulk butter, the United States asked the district court to enter judgment on the market value of the print butter. In its motion, Crown asked the court to reconsider its ruling that the measure of damages is the market value of commercially traded butter. In support of its position, Crown submitted the reports and depositions of its two economic experts, Dr. John Nevin and Dr. Michael Behr.

Dr. Nevin and Dr. Behr both expressed the opinion that fair market value was not the proper measure of the government's damages. Dr. Nevin, an expert on commercial distribution, explained that the destroyed butter did not have a "fair market value" based on the commercial price of butter because the butter was surplus property purposely taken off the commercial market under the price-support program. The price of butter on the Chicago Mercantile Exchange on the day of the fire is only a valid market price for butter that could be exchanged on that market on that day; the price-support butter could not have been sold on the day of the fire. Moreover, if the fire had not occurred, the government would not have sold or donated any additional butter. Thus, there is no true commercial market value for government butter; rather, it is a price-controlled market where the government, and not the market, determines the price. Under these circumstances, Dr. Nevin concluded, awarding "fair market value" as the

measure of damages results in a windfall to the government.

Dr. Behr, an agricultural economist, gave a deposition and submitted both an expert report and an affidavit in support of Crown's motion for reconsideration. He agreed that the market price for commercial butter was irrelevant to the determination of the market price for government butter. In economic terms, he explained, government butter and commercial butter are two separate products. The price-support program works only because it severs the substitutability between commercial and government butter; the commercial market price of butter is maintained only so long as the stocks of government butter are not available for sale in the same market as the commercial butter. Restrictions on disposition render the market value of government butter demonstrably lower than "fair market value." In his affidavit, Dr. Behr calculated a market value for the government butter destroyed in the fire: $0.0475 per pound. He arrived at this figure by dividing the average revenue generated from the government butter during a two-year period by the amount of butter disposed of by the government during that same time frame.

The district court denied Crown's motion for reconsideration and granted the United States' motion in part. The court found that the testimony of Crown's experts, while valid in many respects, is simply irrelevant to the proper legal measure of damages—fair market value. In summarizing the deficiency it saw in Crown's motion, the district court stated:

> Defendants' motion for reconsideration depends on its assertion that the government is not, in fact, a willing seller in the commercial market. The law, however, is concerned with a hypothetical willing seller, not the specific intent or policies of the owner of destroyed property.

> For this reason the government is entitled to recover the commercial market value of the destroyed property as if it were a willing seller in that market even though its own policies prevent it from making such sales. In this case that measure is

clearly established by the commercial exchange rate for the commodities in dispute. R.381, Order of February 23, 1995, at pp. 3–4. Based on the uncontroverted market value figures tendered by the United States, the district court granted partial summary judgment on the amount of damages attributable to the print butter.

The court found that the market value of print butter was either $0.99 or $1.00 per pound, depending on the grade. Using these figures, the court concluded that the United States was entitled to recover $10,791,860.81 in damages for the destruction of the print butter. Summary judgment could not be granted *in toto*, however, because a factual issue remained as to the reasonableness of the clean-up expenses and the amount of a reduction for saved storage expenses. These issues were resolved through stipulations, and the district court entered final judgment against Crown.

In summary, the district court's rulings amount to a finding that, as a matter of law, the United States is entitled to recover the fair market value of the commodities destroyed in the CSW fire. Using the evidence of fair market value submitted by the United States—the prices at which the various commodities were selling on the Chicago Mercantile Exchange—the district court determined the fair market value of the commodities to be as follows:

| | |
|---|---|
| Bulk butter | $ 121,675.78 |
| Print butter | $10,791,860.81 |
| Frozen Vegetables | $ 17,550.00 |

After making the appropriate adjustments for clean-up costs and saved storage expenses, the court entered judgment for the United States in the amount of $10,688,-133.99. Crown now appeals from the rulings of the district court.

## II

## DISCUSSION

### A. *Applicable Law*

We first must determine the governing law in this case. Specifically, we are faced with the question of whether federal or state law ought to govern the appropriate measure of damages when surplus commodities, which

had been purchased by the United States under a federal price-support program, are destroyed in a warehouse fire in Wisconsin.

■■■ As a threshold matter, we note that there is no statutory directive with respect to this issue. *See United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 591, 93 S.Ct. 2389, 2396, 37 L.Ed.2d 187 (1973). Therefore, we must determine whether federal common law ought to provide the rule of decision. First, we consider whether the matter justifies reliance on federal law. *See Clearfield Trust Co. v. United States*, 318 U.S. 363, 366–67, 63 S.Ct. 573, 574–75, 87 L.Ed. 838 (1943). Second, if such a justification exists and federal common law must be the rule of decision, we consider its content. Specifically with regard to this second inquiry, we consider whether to borrow existing state law principles or to "resort to uniform federal rules." *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728–29, 99 S.Ct. 1448, 1458–59, 59 L.Ed.2d 711 (1979).

Turning to the first inquiry, we begin by noting that the Supreme Court has held that a federal rule of decision is appropriate when such a course is "necessary to protect uniquely federal interests." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981). Among those federal interests are situations in which "the rights and obligations of the United States" are at stake. *Id.* at 641, 101 S.Ct. at 2067. This general rule was reiterated in *Kimbell Foods*, when the Court noted that a federal rule of decision must govern "questions involving the rights and liabilities of the United States arising under nationwide federal programs." 440 U.S. at 726, 99 S.Ct. at 1457. In that case, the Court determined that the priority of liens stemming from federal lending programs ought to be determined with reference to state law. In *Little Lake Misere Land Co.*, the Supreme Court fashioned federal common law to protect the federal government's interest in real property: The land acquisition in question was not only authorized by Congress but the rights and liabilities of the United States, as a party, were at stake. *See* 412 U.S. at 594, 93 S.Ct. at 2398. The Supreme Court noted that dealings that

are ordinary or local when conducted between private citizens raise serious questions of national sovereignty when they arise in the context of a specific federal statutory provision. *Id.* at 592, 93 S.Ct. at 2396. This is especially true when transactions involve the federal government. *Id.* Even if there is no specific federal legislation governing a particular transaction to which the United States is a party, the Court continued, a federal court is competent to declare the governing law in an area embracing issues substantially related to an established program of government operation. *Id.* at 593, 93 S.Ct. at 2397. In such circumstances, it is for the federal courts to fashion the governing rule of law according to their own standards. *Id.* at 594, 93 S.Ct. at 2398. The Court's approach in these cases provides the path we must follow in the matter now before us. Although this litigation does not arise directly out of the price-support program, significant federal interests substantially related to the federal program are nonetheless implicated and warrant the application of federal common law. *See Cargill, Inc. v. Commodity Credit Corp.*, 275 F.2d 745, 751–52 (2d Cir.1960) (holding that the CCC's right to recover damages for deterioration of corn stored for it by a warehouseman was governed by federal rather than local law).

■■■ Having determined that a federal rule of decision ought to be applied, we now must address the second inquiry identified earlier. We must decide whether, in fashioning that federal rule, we ought to rely upon state law. It is well established that, in fashioning federal common law, federal courts may, under appropriate circumstances, borrow from state law. *See Clearfield Trust Co.*, 318 U.S. at 367, 63 S.Ct. at 575; *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 707 (7th Cir.1994). Whether state law is to be borrowed to supply the federal rule of decision is a question "of federal policy, affecting not only the federal judicial establishment ... but also Government's legal interests and relations." *Little Lake Misere Land Co.*, 412 U.S. at 595, 93 S.Ct. at 2398 (quoting *United States v. Standard Oil Co.*, 332 U.S. 301, 309, 67 S.Ct. 1604, 1609, 91 L.Ed. 2067 (1947)).

▓▓ Whether it is more appropriate to employ state law as the federal rule of decision or to create a federal rule of independent roots depends upon a variety of considerations related to the nature of the specific governmental interest and to the effects upon them of applying state law. The Supreme Court has described the relevant considerations:

> Undoubtedly, federal programs that "by their nature are and must be uniform in character throughout the Nation" necessitate formulation of controlling federal rules. Conversely, when there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision. Apart from considerations of uniformity, we must also determine whether application of state law would frustrate specific objectives of the federal programs. If so, we must fashion special rules solicitous of those federal interests. Finally, our choice-of-law inquiry must consider the extent to which application of a federal rule would disrupt commercial relationships predicated on state law.

*Kimbell Foods*, 440 U.S. at 728–29, 99 S.Ct. at 1458–59 (citations omitted). Thus, in deciding whether to utilize state law in fashioning a decisional rule in this context, we must examine the need for uniformity in cases involving damage to price-support goods and the harm, if any, that application of Wisconsin law will have on the federal interests at stake.

We believe that, when the circumstances of this case are weighed in light of these factors, it becomes clear that the appropriate course is to borrow principles of Wisconsin law. This case does not arise directly out of the price-support program; uniformity in the administration of the federal program will not be unduly affected, if at all, by resort to established state norms. We deal here with an area of law in which there exists a well-established body of state law principles. *See Powers v. United States Postal Serv.*, 671 F.2d 1041, 1044 (7th Cir.1982) (noting, in the context of the termination of a Post Office lease, that a "powerful argument" for the application of state law is the absence of a federal common law of landlord and tenant). More importantly, no concrete reason has been advanced as to why a different federal rule is necessary to vindicate an important federal interest. Wisconsin's law on the issue of damage to property falls well within the jurisprudential heartland of the common law of damages, and nothing contained therein frustrates any federal policies embodied in the price-support program. *See Little Lake Misere Land Co.*, 412 U.S. at 596–97, 93 S.Ct. at 2399 (declining to select state law as the federal rule of decision because the specific state provisions ran counter to the interests of the federal government). In these circumstances, as the Supreme Court concluded in *Kimbell Foods*, a case dealing with the priority of federal consensual liens, "the prudent course is to adopt the readymade body of state laws as the federal rule of decision until Congress strikes a different accommodation." 440 U.S. at 740, 99 S.Ct. at 1464.

### B. *Measure of Damages*

▓▓ We take as our starting point, as did the district court, the general measure of damages for tort claims involving the complete destruction of personal property: the fair market value of the property at the time and place of its destruction. See Dan B. Dobbs, LAW OF REMEDIES § 5.13(1) (1993); RESTATEMENT (SECOND) OF TORTS §§ 927, 911 (1977); Charles T. McCormick, DAMAGES, § 44 (1935). Our cases have recognized this rule as correctly stating the law of Indiana, *see Simmons, Inc. v. Pinkerton's Inc.*, 762 F.2d 591, 596 (7th Cir.1985), and the law of Illinois, *see H.K. Porter Co. v. Halperin*, 297 F.2d 442, 445 (7th Cir.1961). The fair market value measure of damages also has been adopted in Wisconsin. *See Krueger v. Steffen*, 30 Wis.2d 445, 141 N.W.2d 200, 201–02 (1966); *Hills Bros. Coffee, Inc. v. Dairyland Transp., Inc.*, 157 Wis.2d 645, 460 N.W.2d 433, 435 (Ct.App.1990) (approving Wisconsin pattern jury instruction based on fair market value); *see also Nelson v. Boulay Bros. Co.*, 27 Wis.2d 637, 135 N.W.2d 254, 257 (1965) (adopting market value less salvage value as the measure of damages for the destruction of livestock). Wisconsin law defines market value as "that sum of money the property

would have brought if sold by an owner willing but not required to sell to a buyer willing but not required to buy." *Hills Bros. Coffee,* 460 N.W.2d at 435; *see Schwalbach v. Antigo Electric & Gas, Inc.,* 27 Wis.2d 651, 135 N.W.2d 263, 268 (1965). We must determine, therefore, whether there is an exception to this general rule for cases in which the destroyed property is owned by the United States and was acquired under a price-support program.

Crown contends that there are a number of exceptions to this general rule. It emphasizes that fair market value "should not be applied in cases where it is demonstrated that another rule will better compute actual damages." *The Great Atlantic & Pacific Tea Co. v. The Atchison, Topeka & Santa Fe Ry. Co.,* 333 F.2d 705, 708 (7th Cir.1964). Because the United States could not have sold the surplus butter on the open market without decimating the very market it is obliged by law to support, Crown urges, the United States' actual damages are best measured by its out-of-pocket expenses associated with the fire—the costs it incurred to convert surplus bulk butter into the print butter needed to replenish its inventory in the latter.

In addressing these arguments, we turn first to the guidance supplied by existing case law. Two other circuits have addressed the destruction of price-support and surplus commodities and, in each case, have awarded the United States the full market value of the property destroyed. In *United States v. New York, N.H. & H.R. Company,* 211 F.2d

404 (2d Cir.1954), the United States sought to recover the full market value of price-support potatoes that had been shipped to a state hospital in Connecticut and damaged en route by the defendant railroad. Reasoning that the railroad "should not receive the benefit of the intended donation," the court applied the "usual [rule] under the Cummins Amendment," 49 U.S.C. § 20(11) (repealed 1978), and permitted the United States to recover the full market value of the potatoes at their destination. *New York, N.H. & H.R. Co.,* 211 F.2d at 404.

Similarly in *Fort Worth & Denver Railway Company v. United States,* 242 F.2d 702 (5th Cir.1957), also decided under 49 U.S.C. § 20(11), the CCC had shipped livestock feed to farmers at half-price under an emergency drought-relief program. Shortages occurred in several of the shipments and, although the railway company conceded liability for the amount of the sales price at the destination, the United States sought and obtained a damage award based on full market value. The Fifth Circuit affirmed the award. Noting that section 20(11) provides for damages representing the "full actual loss, damage or injury" to the property at its destination, the Fifth Circuit held that this standard is to be measured by market value. *Id.* at 705.

The actual damages sustained by the United States in this case are no different than the "full actual loss, damage or injury" sustained by the United States in *Fort Worth & Denver Railway Company and New York, N.H. & H.R. Company.*[3] Although these

---

3. In support of its contention that full market value is not the appropriate measure of damages, Crown cites *United States v. Northern Pacific Railway Company,* 116 F.Supp. 277 (D.Minn. 1953). In *Northern Pacific Railway,* the United States purchased potatoes under a price-support program and subsequently contracted to sell them at a price of $0.25 per hundredweight, approximately one sixth of the fair market price. The potatoes were destroyed en route to the purchaser. The United States brought suit against the carrier, and the district court ruled that the contract price was the appropriate measure of damages because the United States was already contractually obligated to sell the goods at that price. *Id.* at 278–79. Crown argues from the court's decision in *Northern Pacific Railway* that the United States' intended disposition of the

surplus butter should color the measure of damages it should receive.

We note that essentially the same argument was rejected by the Fifth Circuit in *Fort Worth & Denver Railway Company, see* 242 F.2d at 705, and by the Second Circuit in *New York, N.H. & H.R. Company, see* 211 F.2d at 404. The *Northern Pacific Railway* approach was later rejected by the same district court in *Land O'Lakes Creameries, Inc. v. Commodity Credit Corp.,* 185 F.Supp. 412, 422 (D.Minn.1960) (awarding damages to the CCC "based on the market price at which the government was purchasing [price-support] dried milk, and not that at which the government was disposing of it"), *aff'd,* 308 F.2d 604 (8th Cir.1962).

Moreover, we agree with the district court that *Northern Pacific Railway* reflects a common exception to the market value rule that is inapplica-

cases involved the interstate shipment of commodities and were decided under a statutory provision no longer in force, our inquiry under the common law—a determination of the actual damages sustained by the United States—is virtually identical to the inquiry made by the Second and Fifth Circuits under 49 U.S.C. § 20(11) in those cases.

Nevertheless, Crown maintains that the United States' out-of-pocket expenses are the appropriate measure of damages in this case. In its view, the United States can be made whole by reimbursement of the costs incurred to convert surplus bulk butter into the print butter needed to replenish its inventory. Confronted with the reality that, under this view, the government ends up with 11 million fewer pounds of bulk butter, Crown responds that the government, which had record level of surplus butter on hand at the time of the fire, was no worse off after the conversion because it could not have sold or donated this butter in any event.

Crown's position—that the United States can be made whole by reimbursement of its out-of-pocket expenses-is based on too limited a view of the actual damage sustained by the United States by this loss. When the fire at CSW deprived the United States of 11 million pounds of surplus butter, it also deprived the government of an asset whose mere existence provided the national government with policy options and bargaining power it would not have had otherwise. The maintenance of these policy options is an integral part of the statutory scheme establishing the support program.[4] As the text of the governing statute quite amply demonstrates, the government has many discretionary options for surplus commodities that do not affect the domestic butter market, including distributions to developing nations, the armed services, schools and prisons. *See* 15 U.S.C. §§ 713, 714. These distributions facilitate the implementation of national policies. Surplus commodities also are bartered for critical materials produced abroad and for materials produced by other government agencies. Because many of these distributions cannot be anticipated by the government and vary with the tide of world events,[5] the availability of stocks of surplus commodities gives the United States certain policy options—and bargaining power with other nations—that it would not otherwise have. A certain value accrues to the government, moreover, as a result of donating commodities for foreign and domestic aid. In order to be made whole, therefore, the United States must receive a measure of damages that permits full restoration of these national assets and the policy options that they provide. It is not the prerogative of the tortfeasor to determine how important or unimportant the destroyed assets were to the government of the United States.

In our view, therefore, the measure of damages adopted by the district court—fair market value of the commodities as of the date of the fire—most accurately reflects the

---

ble to the case before us. The exception applies to situations in which a seller has executed a binding contract for the sale of the subject commodity. *Cf. Greenwood Prods. Co. v. United States*, 188 F.2d 401, 404 (5th Cir.1951) (deciding, in the context of the War Conservation Act, that the United Sates was entitled to damages based on the contract sales price of destroyed peanuts, even though the CCC had acquired them at a lower price). Its underlying rationale is apparent: Under the circumstances of a binding contract for sale, the contract price is a more accurate measure of the value of the property and the loss to the owner than is market value. *See John Morrell & Co. v. Burlington Northern, Inc.*, 560 F.2d 277, 280 (7th Cir.1977).

4. The record reveals that various policy-making bodies within the federal government take part in decisions concerning the stockpiling and distribution of surplus commodities.

At his deposition, Stephen Closson, an official in the Department of Agriculture, testified as follows:

Q. And who decides where it goes overseas for the export donations?

A. The Foreign Agricultural Service and AID and the State Department are involved in that. I'm not an expert in that area.

R.103, Deposition of Stephen R. Closson, at 50.

5. Elsewhere in his deposition, Mr. Closson testified:

We export [surplus butter] a lot to newly independent states of the former Soviet Union after that time, move substantial amounts in what we call the Section 416 program, where we're trying to help the new and struggling nations with stability in their lives, and move a lot of butter oil over there.

R.103, Deposition of Stephen R. Closson, at 48.

actual damages sustained by the United States. We agree with the conclusion of the district court, and the submission of the United States, that any other measure of damages would require an impermissible degree of speculation as to the government's ultimate use of the commodities, as to the value of the intangible benefits accruing to the United States as a result of maintaining stocks of surplus commodities, and as to the state of the market absent government price-support.

██ An award based on the commercial market value of the destroyed commodities enables the United States to restore itself fully to its pre-tort position. *See Chronister Oil Co. v. Unocal Refining & Mktg.*, 34 F.3d 462, 464 (7th Cir.1994) ("[T]he point of an award of damages, whether it is for a breach of contract or for a tort, is, so far as possible, to put the victim back where he would have been had the breach or tort not taken place."); *Halperin*, 297 F.2d at 445 (describing the general common law rule that "the owner of destroyed goods is entitled to be put in as good a position pecuniarily as if his property had not been destroyed"). In this case, putting the United States in the same position in which it would have been had the tort not occurred requires a measure of damages that permits the United States to replace the commodities lost in the fire. It is well established, both in the decisions of the Wisconsin courts [6] and in the *corpus juris* of the several states,[7] that replacement cost is a permissible measure of the actual damages sustained when personal property is destroyed. Our conclusion finds further support in the RESTATEMENT (SECOND) OF TORTS,[8] which suggests that the "market" in "fair

6. *See Schwalbach*, 135 N.W.2d at 268 (noting that, although the value arrived at is evidentiary and not conclusive with the jury, "[t]he replacement cost less depreciation method of determining fair market value is commonly used and is permissible"); *Rosche v. Wayne Feed Div. Continental Grain Co.*, 152 Wis.2d 78, 447 N.W.2d 94, 96 (Ct.App.1989) ("The basic measure of damages for the destruction of livestock is the animal's market value, determined by replacement cost, with an appropriate reduction for any salvage value."); *Northwestern Nat'l Ins. Co. v. Nemetz*, 135 Wis.2d 245, 400 N.W.2d 33, 40 (Ct.App.1986) ("Replacement cost minus depreciation is a permissible method of arriving at the fair market value of property."); *cf. Three & One Co. v. Geilfuss*, 178 Wis.2d 400, 504 N.W.2d 393, 397 (Ct.App.1993) (awarding landlord replacement cost of carpet damaged by tenant); *Otto v. Cornell*, 119 Wis.2d 4, 349 N.W.2d 703, 706–07 (Ct.App.1984) (holding that damages for ornamental trees is not limited to diminished value of the land, but rather could be based on replacement cost).

7. Charles T. McCormick, DAMAGES § 144 (1935) ("[The law] will ordinarily endeavor to award [a plaintiff whose property has been destroyed] such a sum of money as [the plaintiff] might have realized by a sale of the property or services, or as would have enabled [it] to secure other similar property from others."); Dan B. Dobbs, LAW OF REMEDIES § 5.14(1) (1993) ("In a number of instances the plaintiff may be entitled to present proof of repair or replacement cost and even to have the jury instructed that repair or replacement cost is the appropriate measure of damages ...."); *e.g., Ocean Elec. Co. v. Hughes Labs., Inc.*, 636 So.2d 112, 114–15 (Fla.Dist.Ct.App. 1994) (holding that proper market value of stock of goods held for sale and damaged or destroyed

is the wholesale market to which injured party would have to go in order to replace them); *U.S. Borax & Chem. Corp. v. Archer–Daniels–Midland Co.*, 506 N.W.2d 456, 459–60 (Iowa.Ct.App.1993) (awarding replacement cost where significantly higher fair market value would result in windfall); *Puget Sound Power & Light Co. v. Strong*, 117 Wash.2d 400, 816 P.2d 716, 718 n. 2 (1991) (upholding award based on replacement cost where damaged property has no market value) (collecting cases); *Kansas Power & Light Co. v. Thatcher*, 14 Kan.App.2d 613, 797 P.2d 162, 165 (1990) (noting that, where an item has no market value, a damage award may take into account the cost of repair, original value, the loss of use, any special value to the owner, and cost of replacement); *Blackmon v. Mixson*, 755 S.W.2d 179, 182 (Tex.Ct.App.1988) (same); *Stark Bro's Nurseries & Orchards Co. v. Wayne Daniel Truck, Inc.*, 718 S.W.2d 204, 205–06 (Mo.Ct.App.1986) ("In determining market value the usual rule is that merchandise which is utilized as stock by the owner is not valued at its retail price but on the basis of its replacement cost."); *Cooper v. Feeney*, 34 Ohio App.3d 282, 518 N.E.2d 46, 48 (1986) (noting that, where market value of destroyed property cannot feasibly be obtained, valid considerations include value of the property to owner, original cost, replacement cost, salvage value and fair market value at the time of loss); *Flores v. Rizik*, 683 S.W.2d 112, 115 (Tex.Ct.App. 1984) (stating that replacement value is proper measure of damages where destroyed personalty has no market value).

8. The RESTATEMENT (SECOND) provides:

Hence, from the time when a chattel is manufactured to the time of its actual use, there may be many markets in which it is sold. Thus,

market" refers to the market in which the plaintiff would go to replace the damaged product. Under the circumstances of this case, the fair market value of the destroyed commodities—the government's replacement cost—is the appropriate measure of damages.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

MANION, Circuit Judge, dissenting.

Accidental destruction by someone who has to pay top dollar seems to be the best thing that could happen to this butter. Reimbursement of out-of-pocket expenses may not be the proper measure of damages, but the "fair market" value determined by the district court and affirmed by this court is neither a "fair" value nor a "market" value.

Before it was burned, the butter in question was purposely and permanently removed from the commodity market. Because this butter was not "market butter," the district court erred in equating its value, as a matter of law, with the fair market value determined by the Chicago Mercantile Exchange. The uses to which the Commodity Credit Corporation puts such butter does not include marketing it. Indeed, the butter was packaged in wrappers which stated "NOT TO BE SOLD OR EXCHANGED." While a market may exist for butter that cannot be sold or exchanged under federal law, that very limited market is not the same market that is represented on the Exchange. In fact, the price for commercial butter is artificially raised by the price the Commodity Credit Corporation dictates through its purchase of "surplus" butter. Fair market value presupposes a fair market. In this case we are dealing with a controlled market, controlled

by the withdrawal from the market of the very butter destroyed in the fire.

The court correctly determined that it must apply Wisconsin law, but it instead relies upon two old federal cases, *United States v. New York, N.H. & H.R. Co.*, 211 F.2d 404 (2d Cir.1954), and *Ft. Worth & Denver Railway Company v. United States*, 242 F.2d 702 (5th Cir.1957), neither of which considered Wisconsin law. Both cases dealt with Commodity Credit Corporation-owned goods damaged while in railroad transit and thus subject to damages determination under provisions of the Interstate Commerce Act. Because the butter at issue here was not in railroad transit and thus would not be governed by the Interstate Commerce Act (assuming the provisions were still in effect), these two federal cases are not particularly useful. Again, neither case applied Wisconsin law, which, as the court instructs, we are bound to follow.

Wisconsin courts have not been silent on computing damages for destroyed commodities. Except when no such value exists, in Wisconsin fair compensation is generally fair market value. *Hills Bros. Coffee, Inc. v. Dairyland Transport, Inc.*, 157 Wis.2d 645, 460 N.W.2d 433, 435 (Ct.App.1990). But again, we are not dealing with a fair market and thus no "fair market" value exists. Under Wisconsin law, damages are therefore determined by "the value of the property to the plaintiff," calculated by "the nature of the property, the use to which the plaintiff puts such property, its original cost, the cost of replacement, if such property can be replaced, its age, the amount and rate of its depreciation, [and] all other facts and circumstances received in evidence...." *Id.* These measures do not require speculation by a jury. They simply require consideration of several real calculations that would enable a jury to determine the value of this particular butter that had clearly been forever removed from the commercial butter market.

different prices are paid by the wholesaler, the retail dealer and the consumer. Since the measure of recovery is determined by the harm done, the market that determined the measure of recovery by a person whose goods have been taken, destroyed, or detained is that to which he would have to resort in order to replace the subject matter. Thus, the consum-

er can recover the retail price; the retail dealer, the wholesale price. The manufacturer, who does not buy in a market, receives his selling price.

RESTATEMENT (SECOND) OF TORTS § 911 cmt. d. (1977) (cited with approval in *Simmons*, 762 F.2d at 606); *see also Land O'Lakes Creameries*, 185 F.Supp. at 422.

As there is no definitive value for this butter, the weighing of these factors is a task for the jury not the court. *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1554 (7th Cir. 1990) ("fixing of a damage award· is an exercise in fact-finding"). Applying Wisconsin law, a jury would consider those amorphous benefits the United States allegedly derives from maintaining warehouses full of butter (policy options; bargaining power; distribution to developing countries, schools, prisons, and the armed services). However it also would consider the actual cost to the United States of repackaging bulk into print butter. The age of this particular butter and the fact that print butter has a shelf life of only two years would also be factors for a jury to consider. These factors are especially significant in light of the fact that two years after the fire, during fiscal year 1990–1991, the Commodity Credit Corporation showed an inventory loss of 53.9 million pounds of butter, which the defendants suggest was the intentional destruction of unpalatable surplus butter. Thus, if some of this butter was destined for the dump, a jury could consider that. The cost to purchase replacement butter from international butter stores at the world market price, far below the artificially high U.S. price, could also influence a jury's assessment of damages. In short, a jury should have been allowed to consider any number of factors dictating this butter's value. Summary judgment on the ground that this butter had the highest possible value as dictated by the Chicago Mercantile Exchange inappropriately deprived Crown of a jury's consideration of many other factors that probably would have significantly reduced that value. As it stands this fortuitous fire has given the United States a windfall.

I respectfully dissent.